## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NATIVE AMERICAN ARTS, INC.　　　)
an Illinois corporation, as the assignee　)
of Bloom Brothers, a division of Stravina )
Operating Company, L.L.C.　　　　)
　　　　　　　　　　　　　　　)
　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　)
HARTFORD CASUALTY INSURANCE )
COMPANY, an Indiana corporation;　)
　HARTFORD INSURANCE COMPANY )
OF THE MIDWEST, an Indiana　　　)
corporation; and GREAT AMERICAN )
INSURANCE COMPANY, an Ohio　　)
corporation,　　　　　　　　　)
　　　　　　Defendants.　　　　)

**FILED**

JUN 3 0 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

Judge Kocoras

Case Number 03 C 7233

DOCKETED

JUL 0 1 2004

Jury Trial Demanded

### NOTICE OF FILING

To:　Mr. Bob Chaney　　　　　　　Ms. Elizabeth Wright
　　Mr. Jeffrey A. Goldwater　　　　Mr. Kevin Tessier
　　Bollinger, Ruberry & Garvey　　　Neal, Gerber & Eisenberg
　　500 W. Madison St., Suite 2300　　2 N. LaSalle St., Suite 2200
　　Chicago, IL 60661-2511　　　　Chicago, IL 60602

　　　　PLEASE TAKE NOTICE, that on June 30, 2004 Plaintiff filed its MOTION FOR
PARTIAL SUMMARY JUDGMENT ON DUTY TO DEFEND with the Clerk of the Court for
the United States District Court For the Northern District of Illinois, a copy of which is attached
hereto and served upon you.

_____
One of the attorneys for the Plaintiff

### CERTIFICATE OF SERVICE

　　　　I, Scott M. Kolosso, an attorney, certify that I served a copy of the attached pleading via personal
delivery before 5:00 p.m. on June 30, 2004.

_____

Michael Patrick Mullen
Scott M. Kolosso
Mullen & Foster
166 W. Washington Street, Suite 600
Chicago, IL 60602
312/750-1600

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NATIVE AMERICAN ARTS, INC. )
an Illinois corporation, as the assignee )
of Bloom Brothers, a division of )
Stravina Operating Company, L.L.C. )
) Judge Kocoras
)
)
Plaintiff, )
)
) Case Number 03 C 7233
v. )
)
HARTFORD CASUALTY INSURANCE )
COMPANY, an Indiana corporation; )
HARTFORD INSURANCE COMPANY )
OF THE MIDWEST, an Indiana )
corporation; and GREAT AMERICAN )
INSURANCE COMPANY, an Ohio )
corporation, ) Jury Trial Demanded
)
Defendants. )

FILED
JUN 3 0 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED
JUL 0 1 2004

## PLAINTIFF NATIVE AMERICAN ARTS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DUTY TO DEFEND

NOW COMES Plaintiff Native American Arts, Inc. ("Native American Arts" or "NAA"),

as the assignee of Bloom Brothers, a division of Stravina Operating Company, L.L.C., ("Bloom

Brothers" or "BB"), by and through its attorneys, Michael Patrick Mullen, Scott M. Kolosso and

Carla E. Buterman of the law firm of MULLEN & FOSTER, and moves this Honorable Court

pursuant to Rule 56 of the Federal Rules of Civil Procedure and the Local Rules of the United

States District Court for the Northern District of Illinois for partial summary judgment on duty to

defend in its favor and against Defendants Hartford Insurance Company of the Midwest,

Hartford Casualty Insurance Company, and Great American Insurance Company on the pending

Complaint for Declaratory Judgment.  Additionally, based upon a finding that Illinois law

applies to the pending action and a finding that the insurers breached their duties to defend, NAA

moves this Court for partial summary judgment in its favor and against the insurers on their duties to indemnify, based upon an application of Illinois estoppel law. In support thereof, NAA states as follows:

1.     This Declaratory Action was initiated by NAA, as the assignee of Bloom Brothers, a division of Stravina Operating Company, LLC, and requested a declaration that Hartford Insurance Company of the Midwest, Hartford Casualty Insurance Company, and Great American Insurance Company had an obligation to provide a defense and indemnification to Bloom Brothers based on occurrences that gave rise to claims brought against Bloom Brothers in the case <u>Native American Arts, Inc. v. Bloom Brothers, a division of Stravina Operating Company, LLC, et. al.</u>, Case Number 01 C 5716. Said case was filed in the United States District Court for the Northern District of Illinois and alleged various advertising injuries arising from violations of the Indian Arts and Crafts Act, 25 U.S.C. § 305e, by Bloom Brothers. NAA and Bloom Brothers entered into a settlement agreement that resulted in a dismissal with prejudice as to Bloom Brothers. As part of the settlement agreement, in addition to a cash payment, Bloom Brothers assigned its rights against the insurers, who, at the time of settlement, had abandoned and declined to defend or indemnify Bloom Brothers.

2.     As set forth in NAA's memorandum of law in support of its motion for partial summary judgment, which is incorporated herein by reference, it is clear that NAA, as the assignee of Bloom Brothers, is entitled to partial summary judgment as a matter of law on the duty to defend. The allegations in the underlying complaint stated facts against Bloom Brothers which brought the case within, or potentially within, the advertising injury coverage provided by the relevant insurance policies. (*See* <u>Edward Gray Corp. v. Union Fire Ins. Co. of Pittsburgh</u>, 1997 WL 102542 *2 (N.D. Ill. 1997 (J. Kocoras) *citing* <u>Travelers Inc. Cos. v. Penda Corp.</u>, 974

F.2d 823 (7th Cir. 199)("An insurer may not justifiably refuse to defend an action against its

insured unless it is *clear* from the face of the underlying complaints that the allegations fail to

state facts which bring the case within, or potentially within, the policy's coverage." (Emphasis

in original)). The undisputed facts establish that NAA, as the assignee of Bloom Brothers, is

entitled to partial summary judgment on the Complaint for Declaratory Judgment as to duty to

defend.

3.     In addition, NAA contends that Illinois law applies to the pending action. If

Illinois law applies, as a result of the insurers' breach of their duties to defend Bloom Brothers in

the underlying litigation, the insurers are estopped from denying their duties to indemnify Bloom

Brothers as no policy defenses are available to Defendant insurers.

4.     If, as Defendants contend, California law applies, the insurers still must provide

indemnification because the claims in the underlying litigation are actually covered by the

relevant insurance policies. However, based on this Court's June 14, 2004 bifurcation order, the

issue of duty to indemnify will be handled in a subsequent motion, if necessary.

WHEREFORE, Plaintiff Native American Arts, Inc., assignee of Bloom Brothers, a

division of Stravina Operating Company, LLC, respectfully requests that this Honorable Court

enter partial summary judgment on duty to defend and, also, based upon Illinois law, find an

estoppel and a duty to indemnify, in its favor and against Defendants Hartford Insurance

Company of the Midwest, Hartford Casualty Insurance Company, and Great American Insurance

Company and provide the following relief:

a).     Order Defendants Hartford Insurance Company of the Midwest, Hartford

Casualty Insurance Company, and Great American Insurance Company to pay all

costs, including attorney's fees, ($134,444.28), incurred by Bloom Brothers, a

division of Stravina Operating Company, LLC in the defense of Case Number 01

C 5716, and

b).     Order such further relief as this Court deems appropriate.

Respectfully submitted,

One of the attorneys for Plaintiff

Michael Patrick Mullen
Scott M. Kolosso
Carla E. Buterman
MULLEN & FOSTER
166 W. Washington Street, Suite 600
Chicago, Illinois 60602
312-750-1600

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NATIVE AMERICAN ARTS, INC.   )
an Illinois corporation, as the assignee )
of Bloom Brothers, a division of  )
Stravina Operating Company, L.L.C. )  Honorable Judge Kocoras
            )
    Plaintiff,    )
           )  Case Number 03 C 7233
    v.     )
           )
HARTFORD CASUALTY INSURANCE )
COMPANY, an Indiana corporation; )
HARTFORD INSURANCE COMPANY )
OF THE MIDWEST, an Indiana  )
corporation; and GREAT AMERICAN )
INSURANCE COMPANY, an Ohio  )
corporation,      )  Jury Trial Demanded
           )
    Defendants.   )

### PLAINTIFF'S STATEMENT OF UNCONTESTED FACTS

Pursuant to Local Rule 56.1, Native American Arts, Inc., as the assignee of Bloom

Brothers, a division of Stravina Operating Company, LLC, submits the following statement of

material facts as to which there is no genuine issue and that entitles NAA to summary judgment

on duty to defend and estoppel as a matter of law.

**I. Parties**

1. Plaintiff / Assignee Native American Arts, Inc. ("Native American Arts" or "NAA") is a

wholly Indian-owned arts and crafts organization involved in the distribution of authentic Indian-

made arts, crafts and jewelry through various retail establishments located in the Northern

District of Illinois and elsewhere.  In addition, NAA offers, displays and sells its authentic

Indian-made products through various advertising and marketing mediums including, but not

limited to, catalogs, brochures, and flyers both at a wholesale and retail level. NAA also operates an internet website through which it further advertises, markets, offers, displays for sale and sells its authentic Indian-made products. NAA is the assignee of Bloom Brothers, a division of Stravina Operating Company, LLC (hereinafter "Bloom Brothers" or "BB").

2.     On November 6, 2000 Stravina Operating Company, LLC ("Stravina") purchased the assets of Bloom Brothers, a division of Gift Connections, Inc. At that time, Stravina formed a new organization entitled Bloom Brothers, a division of Stravina Operating Company, LLC. BB was a wholesaler, manufacturer and/or supplier engaged in the nationwide offering, displaying for sale and selling of arts, crafts and jewelry products between November 6, 2000 and May 2002. Between at least November 6, 2000 and approximately January 2001 BB manufactured and maintained inventories of the products at issue in Minneapolis, Minnesota and Auburn, Washington.

3.     Defendant Hartford Insurance Company of the Midwest is an Indiana Corporation which is licensed to do business in Illinois and maintains offices in Illinois. Hartford Insurance Company of the Midwest issued three primary insurance policies which are at issue in the pending litigation (Policy No. 72 UNN GN0106). The coverage periods for those three policies are November 22, 1999 to November 22, 2000; November 22, 2000 to November 22, 2001; and November 22, 2001 to November 22, 2002. Each of the three policies at issue have an advertising injury limit of one million dollars ($1,000,000) and a general aggregate limit of two million dollars ($2,000,000).

4.     Defendant Hartford Casualty Insurance Company is an Indiana Corporation which is licensed to do business in Illinois and maintains offices in Illinois. Hartford Casualty Insurance Company issued two excess insurance policies which are at issue in the pending litigation

2

(Policy No. 72 RHU UQ 312 K2). The coverage periods for those two policies are November 22, 1999 to November 22, 2000 and November 22, 2001 to November 22, 2002. The general aggregate limit for the November 22, 1999 to November 22, 2000 is two millions dollars ($2,000,000). The general aggregate limit for the November 22, 2001 to November 22, 2002 is ten millions dollars ($10,000,000).

5.     Defendant Great American Insurance Company is an Ohio Corporation which is licensed to do business in Illinois and maintains offices in Illinois. Great American Insurance Company issued one excess insurance policy which is at issue in the pending litigation (Policy No. TUU 3-57-84-68-00). The coverage period for that policy is November 22, 2000 to November 22, 2001. The general aggregate limit is ten millions dollars ($10,000,000).

**II.     Jurisdiction**

6.     This Court has original jurisdiction over this declaratory action pursuant to 28 U.S.C. § 1332 based upon diversity of citizenship and an amount in controversy in excess of $75,000.

**III.     Venue**

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the insurers conduct business in this judicial district and the underlying transactions occurred herein.

## STATEMENT OF UNCONTESTED FACTS

**IV.     Background and Allegations**

8.     On July 24, 2001, NAA brought a Complaint against BB in the United States District Court for the Northern District of Illinois, Case Number 01 C 5716. (hereinafter "underlying litigation")(Original Complaint is attached to the Motion for Summary Judgment ("MSJ") as Exhibit 31).

3

9.    On May 30, 2002, NAA filed its First Amended Complaint ("Amended Complaint"). (Amended Complaint attached to MSJ as Exhibit 32).

10.    The Amended Complaint alleged violative conduct by BB between November 6, 2000 and May 2002. (Amended Complaint ¶'s 10, 11, 13, 14, 15, 16, 23, and 24).

11.    The Amended Complaint alleged that BB is a wholesaler, manufacturer and/or supplier engaged in the offering, displaying for sale and selling arts, crafts and jewelry products, including but not limited to products in a traditional Indian style motif and design, to various retailers and wholesalers throughout the United States and in the Northern District of Illinois. (Id at ¶ 5).

12.    The Amended Complaint alleged that BB directly and indirectly offered, displayed for sale and sold multiple quantities of various goods in a manner that falsely suggests they are Indian produced, an Indian product, or the product of a particular Indian or particular Indian tribe or Indian arts and crafts organization resident within the United States, including Indian products consisting of artworks, crafts, and jewelry in a traditional Indian style or medium, in violation of the IACA, Title 25 U.S.C. § 305 et. seq. § 305 e, and the regulations promulgated thereunder. (Id at ¶ 9).

13.    The Amended Complaint alleged that the IACA prohibits a person from directly or indirectly offering or displaying for sale or selling goods in a manner that falsely suggests it is Indian produced, an Indian product, or the product of a particular Indian or Indian tribe or Indian arts and crafts organization resident within the United States and provides for an action against such a person by an Indian arts and crafts organization. (25 U.S.C. 305e(a)) (Id at ¶ 6).  In addition, that the IACA provides for statutory damages of one thousand dollars ($1,000) per day for each violative product offered, displayed or sold. (25 U.S.C. 305e(a)) (Id at ¶ 30).

4

14.     The Amended Complaint alleged that BB advertised, marketed, offered and displayed for sale and sold goods directly or indirectly on the Internet in a manner that falsely suggested they are an Indian product, Indian produced or the product of an Indian arts and crafts organization resident within the United States, including Indian products consisting of artworks, crafts and jewelry in a traditional Indian style or medium. (Id at ¶ 10).

15.     The Amended Complaint alleged that BB advertised, marketed, offered and displayed for sale and sold goods directly or indirectly arising from the nationwide dissemination of catalogs, brochures, and sales literature which advertised, marketed, offered and displayed for sale and sold goods in a manner that falsely suggested they are an Indian product, Indian produced or the product of an Indian arts and crafts organization resident within the United States, including Indian products consisting of artworks, crafts and jewelry in a traditional Indian style or medium. (Id at ¶ 11).

16.     The Amended Complaint alleged that BB's advertisement and nationwide dissemination of catalogs, brochures, and sales literature included but was not limited to the distribution of said materials via mailing lists, Internet requests and distribution of catalogs at gift and trade shows. (Id at ¶ 12).

17.     The Amended Complaint alleged that BB advertised, marketed, offered and displayed for sale and sold goods directly or indirectly arising from nationwide attendance of gift and trade shows…in a manner that falsely suggested they are an Indian product, Indian produced or the product of an Indian arts and crafts organization resident within the United States, including Indian products consisting of artworks, crafts and jewelry in a traditional Indian style or medium. (Id at ¶ 13).

5

18.    The Amended Complaint alleged that the products alleged therein are traditional Indian products embodying traditional Indian styles, motifs and designs, traditionally made by Native Americans, and were falsely suggested to be Indian-made Indian products and these products were advertised, marketed, and sold as such, including advertising and marketing these products with other Indian style products expressly represented to be Indian products, or Indian, or Native American made. (Id at ¶ 17).

19.    The Amended Complaint alleged that a substantial portion of the products displayed for sale by BB did contain attached tags of the kind displayed on the Exhibits herein using unqualified terms "Indian", "Native American" and references to named Indian tribes. (Id at ¶ 21).

20.    The Amended Complaint alleged that under the IACA regulations, 25 C.F.R. 309.3(b), that the unqualified use of the terms "Native American," "Indian," or use of the name of an Indian tribe means that the maker is a member of an Indian tribe and the product is an Indian product. (Id at ¶ 20).

21.    The Amended Complaint alleged that a substantial portion of the products displayed for sale by BB did contain attached advertising tags of the kind displayed on the Exhibits therein using unqualified terms "Indian," "Native American" and references to named Indian tribes. (Id at ¶ 21).

22.    In the underlying litigation, BB admitted that the products at issue were not manufactured by any member of an Indian tribe, a member of an Indian arts and crafts organization, or a certified Indian artisan. (See BB's Answer to Amended Complaint attached to MSJ as Exhibit 42).

6

23.    The Amended Complaint alleged that the tags attached to BB's products are advertisements and constitute advertising activity. (Id at ¶ 22).

24.    The Amended Complaint alleged that BB advertised, marketed, offered and displayed for sale and sold goods directly or indirectly in a manner that falsely suggested they are Indian-made, an Indian product, a product of an Indian tribe or the product of an Indian arts and crafts organization resident within the United States, including Indian products consisting of artworks, crafts and jewelry in a traditional Indian style or medium. (Id at ¶ 23).

25.    The Amended Complaint alleged that BB's advertisement, display, offering for sale and sale of Indian style goods in a manner that falsely suggests they are Indian products, Indian produced or the product of a particular Indian or Indian tribe or Indian arts and crafts organization resident within the United States is illegal and should be enjoined in that no adequate remedy at law exists and Plaintiff will be irrevocably injured and damages will be difficult to measure. (Id at ¶ 25).

26.    The Amended Complaint alleged that Native American Arts has been injured and damaged as a result of BB's actions alleged therein. Native American Arts is a competitor of BB and has suffered competitive injuries as a result of BB's actions alleged therein, as well as other damages. Native American Arts advertises, markets and sells authentic Indian-made products similar to those products advertised, offered, displayed and sold by BB falsely suggested to be Indian products, including but not limited to arts, crafts, artworks and jewelry in a traditional Indian style or medium including designs involving dreamcatchers, mandellas, medicine wheels, shields, Kachinas, feathers, animal fetishes, Indian fetishes, bear claw designs, bear design, Kokopelli and other Indian products. (Id at ¶ 26).

7

27.     The Amended Complaint alleged that the injuries suffered by Native American Arts, Inc.
include, but are not limited to, advertising injury arising out of BB's misappropriation of Native
American Art, Inc.'s advertising ideas and style of doing business. (Id at ¶ 27).

28.     The Amended Complaint alleged that the injuries suffered by Native American Arts, Inc.
include, but are not limited to, advertising injury arising out of BB's infringement of title by
falsely suggesting and misrepresenting that their products were Indian made when they were not.
(Id at ¶ 28).

29.     The Amended Complaint alleged compensatory damages in excess of fifteen million
dollars ($15,000,000.00). (Id at ¶ 32).

30.     One April 3, 2003, one of the attorneys for BB, Jeffrey Waksman, sent a correspondence
to Hartford tendering the defense and indemnification of the underlying litigation. Included with
said tender letter, Mr. Waksman sent copies of NAA's First Amended Complaint and BB's
Answer. (See April 3, 2003 correspondence attached to MSJ as Exhibit 33).

31.     On May 30, 2003, Mr. Jeffrey Waksman sent a correspondence to Hartford stating that
"to date, we have not yet received a response regarding our April 3, 2003 tender of defense letter
to Hartford." Mr. Waksman further informed Hartford that BB had received offers from NAA to
settle the underlying litigation within policy limits and that it would be advisable to engage in
settlement discussions at that time. (See May 30, 2003 correspondence attached to MSJ as
Exhibit 34).

32.     On July 16, 2003, Mr. Jeffery Waksman sent a correspondence to Hartford stating that
BB had not yet received a formal response to its April 3, 2003 tender of defense and coverage
letter. The July 16, 2003 correspondence further states that authorized agents of Hartford had
indicated in conversations that Hartford would likely deny defense and coverage in the

8

underlying litigation; that BB and NAA had negotiated a settlement in principle; that the settlement in principle was reasonable and reached in good faith; and that NAA had requested that BB consider an assigned claim value in the amount of $9 million to $10 million, if Hartford declined it's duty to defend. (See July 16, 2003 correspondence attached to MSJ as Exhibit 35).

33.    On July 17, 2003, Hartford sent two correspondence to Mr. Waksman, stating "that there is no coverage for the defense or indemnity of Stavina-Bloom relative to this matter under Stravina Operating's policies and therefore, we are denying coverage with respect to this tender of Stravina Bloom." (See July 17, 2003 declination letters attached to the MSJ as Exhibit 36).

34.    In Hartford's July 17, 2003 declination letter, Hartford denied a defense and indemnification. (See second July 17, 2003 Declination letter also attached to the MSJ as Exhibit 36).

35.    In regard to Great American Insurance Company ("Great American"), on July 25, 2003 BB tendered the defense of the underlying litigation. (See July 25, 2003 correspondence attached to MSJ as Exhibit 37).

36.    In BB's July 25, 2003 correspondence tendering defense of the underlying litigation, Great American was informed that NAA and BB had negotiated the amount of a cash payment and that the parties were still negotiating at that time the value of the assigned claim against any non-defending insurers.  The correspondence further stated that NAA had requested that BB consider an assigned claim value in the amount of $3 million against non-defending insurers. (Id.).  In an entry dated August 14, 2003, Great American's claims file acknowledges it was aware of these ongoing settlement negotiations and the amounts thereof and that coverage for claims would be excluded under the policy. (See MSJ Exhibit 14, Great American's bate-stamp numbers GA0007 and GA0009).

9

37.     On August 28, 2003, NAA and BB executed the settlement agreement in the underlying litigation. The settlement consisted of a cash payment amount of $150,000 plus a settlement value of $3,000,000 for the assignment of claims of indemnity based upon three policy years against AI's insurers for a total of $3,150,000 plus attorney's fees. (Affidavit of Matthew Mullen ¶'s 7 and 10).

38.     On September 10, 2003, Great American denied the tender of defense and coverage for the underlying litigation. (See September 10, 2003 declination letter attached to the MSJ as Exhibit 38). Despite not providing BB a formal denial until the September 10, 2003 correspondence, Great American's claims file indicates that on August 14, 2003 a decision had already been made to deny BB's tender. (See MSJ Exhibit 14, Great American's bate-stamp numbers GA0007 and GA0009).

39.     On October 14, 2003, NAA, as the assignee of BB, initiated the pending lawsuit, Case Number 03 C 7233, by filing a Complaint for Declaratory Judgment against Hartford Insurance Company of the Midwest, Hartford Casualty Insurance Company and Great American Insurance Company. Said complaint sought a declaration of the insurers' obligations to provide a defense and indemnification to BB relative to the claims made in the underlying litigation and to order the insureds to pay the amount of the settlement, plus attorney's fees. (See Amended Complaint).

V.     **Hartford Insurance Company of the Midwest's Insurance Policies**

40.     Hartford Insurance Company of the Midwest issued three primary commercial general liability insurance policies which are at issue in the pending litigation. The policy number for those policies is 72 UUN GN0106. The aforementioned insurance policies issued by Hartford Insurance Company of the Midwest were effective during the relevant period of time covered by the Amended Complaint. The coverage periods for those three policies are November 22, 1999

10

to November 22, 2000; November 22, 2000 to November 22, 2001; and November 22, 2001 to November 22, 2002. (Hartford's Answer's ¶ 10)(99-00 policy attached to MSJ as Exhibit 7; 00-01 policy attached to MSJ as Exhibit 8; and 01-02 policy attached to MSJ as Exhibit 9).

41.     The annual coverage amounts for each of the three coverage periods was one million dollars ($1,000,000) for advertising injury with a general aggregate of two million dollars ($2,000,000). (See MSJ Exhibits 7-9, Hartford's production bate-stamp number H00708, H00893, and H01094 respectively).

42.     BB was a named insured under all three coverage periods.   The 00-01 policy lists BB as a named insured. (See MSJ Exhibit 8, Hartford's production bate-stamp number H00782).

43.     The 01-02 policy lists BB as a named insured. (See MSJ Exhibit 9, Hartford's production bate-stamp number H00955).

44.     The 99-00 policy lists Fason Souvenir and Novelties as a named insured. (See MSJ Exhibit 7, Hartford's production bate-stamp number H00581).  In the 00-01 policy, BB is listed as a d/b/a of Fason Souvenir and Novelties. (See MSJ Exhibit 8, Hartford's production bate-stamp number H00782).

45.     BB was also a named insured during the 99-00 coverage period because the policy provides that "[a]ny organization you newly acquire or form...will be deemed to be an 'insured' if there is no other similar insurance available to that organization." (See MSJ Exhibit 7, Hartford's production bate-stamp number H00715).

46.     Stravina Operating Company LLC was a named insured under all three relevant policies. (See MSJ Exhibit 7, Hartford's production bate-stamp numbers H00580).

11

47.     Hartford Insurance Company of the Midwest's 99-00 policy provides coverage for "advertising injury" caused by an "advertisement of your [the insured's] goods, products or services. (See MSJ Exhibit 7, Hartford's production bate-stamp numbers H00725).

48.     Under Hartford Insurance Company of the Midwest's 99-00 policy "advertising injury" means injury arising out of one or more of the following offenses:

      c.  Copying, in your 'advertisement,' a person's or organization's 'advertising idea' or style of 'advertisement' or

      d.  Infringement of ...title of any...artistic work, in your advertisement. (See MSJ Exhibit 7, Hartford's production bate-stamp numbers H00726).

49.     Under Hartford Insurance Company of the Midwest's 99-00 policy "advertisement" means a dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:

      a.  (1) Radio;

         (2) Television;

         (3) Billboard;

         (4) Magazine;

         (5) Newspaper; or

      b.  Any other publication that is given widespread public distribution. (Id).

50.     Under Hartford Insurance Company of the Midwest's 99-00 policy "advertising idea" means any idea for an "advertisement." (Id).

51.     Hartford Insurance Company of the Midwest's 00-01 policy provides identical coverage for advertising injury as set forth in paragraphs 47-50 herein. (See MSJ Exhibit 8, Hartford's production bate-stamp numbers H00912).

52.     Hartford Insurance Company of the Midwest's 01-02 policy provides identical coverage for advertising injury as set forth in paragraphs 47 – 50 herein except the following definition of "advertisement" and "advertising injury." Under the 01-02 policy, "advertisement" means a widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through:

    a.  (1) Radio;

        (2) Television;

        (3) Billboard;

        (4) Magazine;

        (5) Newspaper;

        (6) The Internet; or

    b.  Any other publication that is given widespread public distribution.

Under the 01-02 policy, "advertising injury" means:

    f.  Copying, in your "advertisement," or on "your website," a person's or organization's 'advertising idea' or style of 'advertisement' or

    g.  Infringement of …title of any…artistic work, in your "advertisement" or on "your website." (See MSJ Exhibit 9, Hartford's production bate-stamp numbers H01114 – H01115).

## VI.    Hartford Casualty Insurance Company's Insurance Policies

53.     Hartford Casualty Insurance Company issued two excess commercial general liability insurance policies which are at issue in the pending litigation. The coverage periods for those two policies are November 22, 1999 to November 22, 2000 and November 22, 2001 to November 22, 2002. The policy number for the 99-00 policy is 72 RHU GM 9788. The policy

number of the 01-02 policy is 72 RHU UQ 312 K2. (99-00 policy attached as MSJ Exhibit 10 and 01-02 policy attached as MSJ Exhibit 11).

54.     The general aggregate limit of insurance for the 99-00 policy is two millions dollars ($2,000,000). (See MSJ Exhibit 10, Hartford's production bate-stamp number H01147).

55.     The general aggregate limit of insurance for the 01-02 policy is ten millions dollars ($10,000,000). (See MSJ Exhibit 11, Hartford's production bate-stamp number H01182).

56.     BB was a named insured during both the 99-00 and 01-02 coverage periods. The 99-00 and 01-02 excess policies provide that "[e]ach person or organization...who is an 'insured' in the 'underlying insurance' is an 'insured' under this insurance." In addition, the 99-00 excess policy provides that "[a]ny organization you newly acquire or form...will be deemed to be an 'insured' if there is no other similar insurance available to that organization." (See MSJ Exhibits 10 and 11, Hartford's production bate-stamp numbers H01155 and H01190, respectively). Also, in the 01-02 excess policy, BB is listed as a named insured. (See MSJ Exhibit 11, Hartford's production bate-stamp number H01197).

57.     Stravina Operating Company LLC was a named insured under the 99-00 and 01-02 excess policies. (See MSJ Exhibits 10 and 11, Hartford's production bate-stamp numbers H01165 and H01197 respectively).

58.     BB was also a named insured under the 99-00 policy because said policy lists Fason Souvenir and Novelties as a named insured. (See MSJ Exhibit 7, Hartford's production bate-stamp number H00581). The 00-01 policy lists BB as a d/b/a of Fason Souvenir and Novelties. (See MSJ Exhibit 8, Hartford's production bate-stamp number H00782).

14

59.    Hartford Casualty Insurance Company's 99-00 excess policy provided identical coverage for advertising injury as the underlying primary policy set forth in paragraphs 47 to 50 and incorporated herein. (See MSJ Exhibit 10, Hartford's production bate-stamp number H01161).

60.    Hartford Casualty Insurance Company's 01-02 excess policy provided identical coverage for advertising injury as the 01-02 primary policy, which is set forth in paragraph 52 and incorporated herein. (See MSJ Exhibit 11, Hartford's production bate-stamp number H1195).

**VII.    Great American Insurance Company's Insurance Policy**

61.    Great American Insurance Company issued one excess commercial general liability insurance policy which is at issue in the pending litigation. The coverage period for the excess policy is November 22, 2000 to November 22, 2001. The policy number for the 00-01 policy is TUU 3-57-84-68-00. (Great American's Answer to Amended Complaint (See Great American's Answer) ¶ 12)(00-01 excess policy attached as MSJ Exhibit 13).

62.    The general aggregate limit of insurance for the 00-01 excess policy is ten million dollars ($10,000,000). The effective date of the excess policy was November 22, 2000. (Great American's Answer ¶ 12).

63.    BB was a named insured under the 00-01 excess policy because a Great American endorsement specifically lists BB as a named insured effective 11-22-00. (See MSJ Exhibit 13, Great American production bate-stamp number GA0071).

64.    BB was a named insured under the 00-01 excess policy because the policy provides that a named insured is "any company of which you [Stravina] own more than 50%, as of the effective date of this policy." (See MSJ Exhibit 13, Great American's production bate-stamp number GA0040). The effective date of the excess policy was November 22, 2000. After November 6,

2000, Stravina owned more than 50% of the assets of BB (See answer to Interrogatory No. 3, attached to MSJ as Exhibit 43).

65. Stravina Operating Company LLC was a named insured under the 00-01 excess policy. (Great American's Answer ¶ 12).

66. Great American Insurance Company's 00-01 excess policy provides coverage for advertising injury. The excess policy defines "advertising injury" as "injury arising solely out of the advertising activities of any 'Insured' as a result of one or more of the following offenses during the policy period:

    3.    misappropriation of advertising ideas or style of doing business; [or]

    4.    infringement of...title. (See MSJ Exhibit 13, Great American's production bate-stamp number GA0040).

67. Great American Insurance Company's 00-01 excess policy contains a following form endorsement which states that coverage for advertising injury is provided to the extent of any underlying insurance and for no broader coverage than is provided by such underlying coverage. (See MSJ Exhibit 13, Great American's production bate-stamp number GA0054).

**VIII.  Settlement Negotiations**

68. Between April 2002 and September 2002 NAA and BB engaged in good faith settlement negotiations conducted at arms-length by the attorneys for NAA and BB. In September 2002, NAA withdrew all settlement offers because discovery in the underlying litigation revealed additional facts showing a much larger potential liability attributable to BB than originally believed by NAA (Affidavit of Matthew Mullen ¶ 8).

69. In the period of time from May 2003 through August 28, 2003, NAA and BB engaged in good faith negotiations to settle the underlying case which consisted of a cash payment and

assigned claims. NAA and AI exchanged offers and counteroffers ranging from $10,450,000 to $1,150,000 (Id. at ¶ 9).

70.     On August 28, 2003, the parties executed the settlement and release which provided for BB to pay $150,000 cash plus a settlement value of $3,000,000 for the assignment of claims of indemnify based upon three policy years against BB's insurers for a total of $3,150,000 plus attorneys fees. The settlement agreement was the result of good faith arms-length negotiations between NAA and BB and their respective attorneys. (Id. at ¶ 10).

71.     On numerous occasions between May 29, 2003 and August 28, 2003, Mr. Jeffrey Waksman spoke telephonically with authorized agents of Hartford and informed Hartford of the settlement negotiations with NAA and the amounts of said settlement being discussed, including the proposed values of any assigned claims. (See MSJ Exhibit 12, Hartford's production bate-stamp numbers H00009 - H00013).

72.     The total settlement amount of $3,150,000 was below the coverage limits applicable to BB which totaled twenty-five millions dollars ($25,000,000) for the three years at issue. (Affidavit of Matthew Mullen ¶11).

73.     Prior to settlement, the parties reported progress of the settlement negotiations to Judge Gettleman and on September 4, 2003, Judge Gettleman held that the settlement agreement between NAA and BB was reached in "good faith" and "without collusion" when he entered the Agreed Order in the underlying litigation. (See Agreed Order ¶ 8 attached to MSJ Exhibit 40).

74.     During the settlement negotiations between May 2003 and August 2003, it was the belief of NAA, based upon the representations made by Hartford and Great American, that the insurance companies denied that BB was a named insured under the 99-00 and 00-01 policies. (Affidavit of Matthew Mullen ¶ 12).

75.    As a result of NAA's understanding that there was a denial that BB was a named insured

under the 99-00 and 00-01 policies, NAA valued the litigation, including the assignment of

claims against Hartford and Great American, less than if there was no denial that BB was a

named insured. This resulted in prejudice to NAA. (Id. at ¶ 13).

## IX.    Additional Uncontested Facts

76.    NAA is in the business of selling authentic Indian-made Indians products. The core

concept or strategy of NAA's style of advertisement is that it sells only authentic Indian-made

products advertised and marketed as Indian-made and emphasizes this fundamental point in all

its advertising and marketing operations. The purpose of the strategy is to have the consuming

public associate NAA with authentic Indian-made products. NAA attaches advertising cards to

all their products, which state that the product is Indian-made and identifies the maker and tribal

affiliations. (Affidavit of Matthew Mullen ¶ 14).

77.    Hartford was confronted with nearly identical allegations under the IACA for another of

its insured, Funky Fiber Works, sued as a defendant in Case Number 01 C 1618, and in that

instance Hartford defended their insured, took part in settlement discussions, and fully

participated to settle the matter. (Id. at ¶ 15)

78.    In NAA v. Barry Owen, Inc., Case Number 01 C 5873, Hartford was confronted with

nearly identical allegations under the IACA for another of its insured, Barry-Owen, Inc., and in

that instance Hartford defended their insured, took part in settlement discussions, and fully

participated to settle the matter. (Id. at ¶ 16)

79.    In a Hartford claims note dated July 31, 2001, there is an entry which states "[t]his is a

California contract in a venue where we are required to provide '[P]epper's counsel' which is

akin to the [C]umus counsel called for in California. This coupled with the fact that this is an AI

[advertising injury] case will make this a very expensive case to litigate. (*See* MSJ Exhibit 12, Hartford's production bate-stamp numbers H00002-H00003.

80.    Between November 6, 2000 and at least January 2001 BB maintained its location in Auburn, Washington.  Also, pursuant to the asset purchase agreement § 4.5, BB maintained inventory of the products at issue until at least November 30, 2000 at locations in Minneapolis, Minnesota (See Schedule 1.1(a)) and in Auburn, Washington.  (Affidavit of Matthew Mullen ¶ 17).

81.    Seven Northern District of Illinois courts have held that the IACA merely regulates misleading commercial speech.  See NAA v. Village Originals, Inc., 25 F. Supp. 2d 876 (N.D. Ill. 1998)(J. Manning); NAA v. Earthdweller, Ltd. et. al., 2001 U.S. Dist. Lexis 12010 (N.D. Ill.)(J. Conlon); Ho-Chunk Nation v. Nature's Gifts, Inc., 1999 WL 169319 (N.D. Ill.)(J. Holderman); NAA v. Bundy-Howard, Inc. et. al., 168 F. Supp. 2d 905 (N.D. Ill.)(J. Shadur); NAA v. Giftmart Trading Post, et. al., Case No. 01 C 2892 (J. Bucklo)(1-16-2002 Memorandum Opinion); NAA v. Alchemists, Inc., Case No. 01 C 2371 (J. Gettleman)(10-1-2001 Memorandum Opinion); and NAA v. Novelty, Inc., Case No. 01 C 5347, (J. Norgle)(5-17-2002 Minute Order).

Respectfully submitted,

One of the attorneys for Plaintiff

Michael Patrick Mullen
Scott M. Kolosso
Carla E. Buterman
MULLEN & FOSTER
166 W. Washington Street, Suite 600
Chicago, Illinois 60602
312-750-1600

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NATIVE AMERICAN ARTS, INC.<br>an Illinois corporation, as the assignee<br>of Bloom Brothers, a division of<br>Stravina Operating Company, L.L.C. | )<br>)<br>)<br>)<br>) | Judge Kocoras |
| | )<br>) | |
| Plaintiff, | )<br>) | Case Number 03 C 7233 |
| v. | )<br>) | |
| HARTFORD CASUALTY INSURANCE<br>COMPANY, an Indiana corporation;<br>HARTFORD INSURANCE COMPANY<br>OF THE MIDWEST, an Indiana<br>corporation; and GREAT AMERICAN<br>INSURANCE COMPANY, an Ohio<br>corporation, | )<br>)<br>)<br>)<br>)<br>)<br>) | Jury Trial Demanded |
| Defendants. | )<br>) | |

## PLAINTIFF NATIVE AMERICAN ARTS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT EXHIBITS

"Artistic Impressions" shall mean Stravina Operating Company, LLC d/b/a Artistic Impressions and d/b/a Feathers.

"Bloom Brothers" shall mean Bloom Brothers, a division of Stravina Operating Company, LLC.

"Hartford" shall mean Hartford Insurance Company of the Midwest and Hartford Casualty Insurance Company.

"Great American" shall mean Great American Insurance Company.

"General Exhibits" shall mean exhibits which are cited or referenced in both Declaratory Actions, Case Number 03 C 7233 and Case Number 03 C 7234.

"Artistic Impressions' Exhibits" shall mean exhibits which are cited or referenced in Case Number 03 C 7234.

"Bloom Brother's Exhibits" shall mean exhibits which are cited or referenced in Case Number 03 C 7233.

**The Exhibits listed below were filed in the corresponding case, Case No. 03 C 7234. Said Exhibits are incorporated into Case Number 03 C 7233 by reference.

1

| Exhibit No. | Description |
|---|---|

General Exhibits:

| | |
|---|---|
| 1 | Flodine v. State Farm Insurance Company, 2001 WL 204786 (N.D. Ill. 2001)(Judge Gottschall) |
| 2 | Flodine v. State Farm Insurance Company, 2003 WL 1394977 (N.D. Ill. 2003)(Judge Gottschall) |
| 3 | Platinum Technology, Inc. v. Federal Insurance Company, 2000 WL 875881 (N.D. Ill. 2001) |
| 4 | Ben Berger & Son, Inc. v. Am. Motorist Ins. Co., 1995 WL 386560 (S.D.N.Y. 1995) |
| 5 | Native American Arts, Inc. v. Bundy-Howard, Inc., Feathers, et. al., 168 F.Supp.2d 905 (N.D. Ill. 2001)(J. Shadur) |
| 6 | Native American Arts, Inc. v. Bundy-Howard, Inc., Feathers, et. al., 10-16-2001 Memorandum Opinion (J. Shadur) |
| 7 | Hartford Insurance Company of the Midwest's November 22, 1999 to November 22, 2000 primary insurance policy, Hartford bate-stamp numbers H00580, H00581, H00584, H00601, and H00707 – H00748 |
| 8 | Hartford Insurance Company of the Midwest's November 22, 2000 to November 22, 2001 primary insurance policy, Hartford bate-stamp numbers H00766, H00782, and H00891 – H00936 |
| 9 | Hartford Insurance Company of the Midwest's November 22, 2001 to November 22, 2002 primary insurance policy, Hartford bate-stamp numbers H00955, H00978, and H01093 – H01139 |
| 10 | Hartford Casualty Insurance Company's November 22, 1999 to November 22, 2000 excess insurance policy, Hartford bate-stamp numbers H01141 – H01174 |
| 11 | Hartford Casualty Insurance Company's November 22, 2001 to November 22, 2002 excess insurance policy, Hartford bate-stamp numbers H01176 – H01206 |
| 12 | Excerpts from Hartford's claim file bate-stamp numbers H00002, H00003, H00009 – H00013, and H01210 |
| 13 | Great American Insurance Company's November 22, 2000 to November 22, 2001 excess insurance policy, Great American bate-stamp numbers GA0034 – GA0071. |

| | |
|---|---|
| 14 | Excerpts from Great American Insurance Company's claim file bate-stamp numbers GA0007 and GA0009 |

Artistic Impressions' Exhibits:

| | |
|---|---|
| 15 | Original Complaint filed March 7, 2001 |
| 16 | First Amended Complaint filed May 23, 2001. (Excludes Exhibits 53 to 292 which involves other unrelated defendants and counts) |
| 17 | Second Amended Complaint filed January 31, 2002 |
| 18 | Third Amended Complaint filed on or about February 18, 2003 |
| 19 | Bundy-Howard, Inc. d/b/a Bear Tracks' Cross-Claim against Artistic Impressions filed on or about March 27, 2002 |
| 20 | Bundy-Howard, Inc. d/b/a Bear Tracks' Amended Cross-Claim against Artistic Impressions filed on or about July 1, 2003 |
| 21 | Hartford's August 27, 2001 declination letter regarding Artistic Impressions |
| 22 | April 3, 2003 tender letter from Artistic Impressions to Hartford |
| 23 | May 30, 2003 letter from Artistic Impressions to Hartford |
| 24 | July 16, 2003 letter from Artistic Impressions to Hartford |
| 25 | Hartford's July 17, 2003 declination letter regarding Artistic Impressions(2) |
| 26 | July 25, 2003 tender letter from Artistic Impressions to Great American |
| 27 | Great American's September 10, 2003 declination letter regarding Artistic Impressions |
| 28 | Artistic Impressions' answers to Native American Arts' Interrogatory No.'s 11 and 12 in underlying litigation |
| 29 | Agreed Order entered by Judge Shadur on August 27, 2003 |
| 30 | Affidavit of Mr. Matthew Mullen in Case Number 03 C 7234, President of Native American Arts, Inc. and President of the Chicago Branch of the Ho-Chunk Nation |

<u>Bloom Brother's Exhibits:</u>

| | |
|---|---|
| 31 | Original Complaint filed July 24, 2001 |
| 32 | First Amended Complaint filed May 30, 2002 |
| 33 | April 3, 2003 tender letter by Bloom Brothers to Hartford |
| 34 | May 30, 2003 letter from Bloom Brothers to Hartford |
| 35 | July 16, 2003 letter from Bloom Brother to Hartford |
| 36 | Hartford's July 17, 2003 declination letter regarding Bloom Brothers(2) |
| 37 | July 25, 2003 tender letter from Bloom Brothers to Great American |
| 38 | Great American's September 10, 2003 declination letter regarding Bloom Brothers |
| 39 | Affidavit of Mr. Jeffrey King, an independent sales representative for Bloom Brothers |
| 40 | Agreed Order entered by Judge Gettleman on September 4, 2003 |
| 41 | Affidavit of Mr. Matthew Mullen in Case Number 03 C 7233, President of Native American Arts, Inc. and President of the Chicago Branch of the Ho-Chunk Nation |
| 42 | Bloom Brothers' Answer to Amended Complaint in underlying litigation |
| 43 | Bloom Brothers' Answer to Native American Arts, Inc.'s Interrogatory No. 3 in underlying litigation |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NATIVE AMERICAN ARTS, INC.　　　)
an Illinois corporation, as the assignee　)
of Bloom Brothers, a division of Stravina　)
Operating Company, L.L.C.　　　　)
　　　　　　　　　　　　　　　　)　　Judge Kocoras
　　　　　　　Plaintiff,　　　　　)
　　　　　　　　　　　　　　　　)　　Case Number 03 C 7233
　　　　　　　　　　　　　　　　)
HARTFORD CASUALTY INSURANCE　)
COMPANY, an Indiana corporation;　)
HARTFORD INSURANCE COMPANY　)
OF THE MIDWEST, an Indiana　　　)
corporation; and GREAT AMERICAN　)
INSURANCE COMPANY, an Ohio　　)
corporation,　　　　　　　　　　)
　　　　　　　Defendants.　　　　)　　Jury Trial Demanded

*FILED*

JUN 3 0 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**DOCKETED**

JUL 0 1 2004

### NOTICE OF FILING

To:　Mr. Bob Chaney　　　　　　　　Ms. Elizabeth Wright
　　Mr. Jeffrey A. Goldwater　　　　　Mr. Kevin Tessier
　　Bollinger, Ruberry & Garvey　　　　Neal, Gerber & Eisenberg
　　500 W. Madison St., Suite 2300　　　2 N. LaSalle St., Suite 2200
　　Chicago, IL 60661-2511　　　　　Chicago, IL 60602

PLEASE TAKE NOTICE, that on June 30, 2004 Plaintiff filed its MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT ON DUTY TO DEFEND with the Clerk of the Court for the United States District Court For the Northern District of Illinois, a copy of which is attached hereto and served upon you.

_____
One of the attorneys for the Plaintiff

### CERTIFICATE OF SERVICE

I, Scott M. Kolosso, an attorney, certify that I served a copy of the attached pleading via personal delivery before 5:00 p.m. on June 30, 2004.

_____

Michael Patrick Mullen
Scott M. Kolosso
Mullen & Foster
166 W. Washington Street, Suite 600
Chicago, IL 60602
312/750-1600

# TABLE OF CONTENTS

Page

I.      Summary                                                                     1

II.     Construction of an Insurance Contract                                       2

III.    Choice of Law                                                               3

III(A). An Analysis of the Lapham-Hickey Factors Favors Illinois Law               4

IV.     The Relevant Insurance Contracts                                           8

IV(A).  Bloom Brothers was a Named Insured Under all Relevant Policies             8

V.      Standard for Duty to Defend                                               10

VI.     Allegations                                                               11

VII.    Allegations in the Underlying Complaint Fall Within, or Potentially       14
        Within, the Relevant Coverage Provisions Relating to Advertising
        Injury

VII(A). Allegations of Copying a Person's or Organization's Advertising Idea       15
        or Style of Advertisement are Synonymous with Misappropriation
        of a Person's or Organization's Advertising Idea or Style of Doing
        Business

VII(B). Allegations of Advertising Injury for Copying NAA's Style of Doing         16
        Business

VII(C). Allegations of Advertising Injury for Copying NAA's Advertising Ideas      19

VII(D). Allegations of Advertising Injury for Infringement of Title                19

VIII.   Advertising Activity Caused NAA's Advertising Injuries                     20

IX.     The Insurers are Estopped to Deny Policy Coverage                         23

IX(A).  Under Illinois law, the Insurers are Estopped to Deny Policy Coverage      23

IX(B).  Under California law, the Insurers are Estopped to Deny Policy Coverage    24

X.      Conclusion                                                                25

## TABLE OF AUTHORITIES

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)

Flodine v. State Farm Ins. Co.,, 2001 WL 204786 (N.D. Ill. 2001)

Employers Ins. Co. of Wausau v. Ehlco, 186 Ill.2d 127, 150-151(Ill. 1999)

Flodine v. State Farm Ins. Co., 2003 WL 1394977 (N.D. Ill. 2003)

J.L. Simmons Co., Inc. v. Fidelity & Casualty Co., 511 F. 2d 87 (7th Cir. 1975)

American Fire & Gas Co., v. Broeren Russo Const., Inc.,
54 F Supp. 2d 842 (C.D.Ill.1999)

Rosenberg v. Zurich American Ins. Co., 312 Ill. App. 3d 97 (Ill. App. 1 Dist. 2000)

Transamerica Ins. Co. v. South, 975 F. 2d 321 (7th Cir. 1992)

Insurance Co. of Illinois v. Stringfield, 292 Ill. App. 3d 471 (1st Dist. 1997)

Consolidated American Ins. Co. v. Mike Soper Marine Services,
951 F.2d 186, 188 (9th Cir. 1991)

In re Air Crash Disaster, 644 F.2d 594, 605 (7th Cir. 1981)

Maneikes v. St. Paul Ins., 655 F.2d 818 (7th Cir. 1981)

A. Kush & Assoc. Ltd. v. American States Ins., 927 F.2d 929, 934 (7th Cir. 1991)

Sunseri v. Camperos Del Valle Stables, Inc.,
185 Cal.Rptr.3d 559, 561 (Cal.Ct. App. 1986)

Hartford Accident and Indemnity Co. v. Civil Service Employees Ins. Co.,
108 Cal.Rptr. 737,741 (Cal.Ct.App. 1973)

Miller v. Elite Ins. Co., 161 Cal.Rptr. 322, 329 (Cal.Ct.App. 1980)

Baron v. Ford Motor Co., 965 F. 2d 195, 197 (7th Cir. 1992)

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)

Lapham-Hickey Steel Corp. v. Protection Mutual Ins. Co., 166 Ill2d 520 (Ill. 1995)

Evangelical Lutheran Church in American et. al. v. Atlantic Mutual Ins. Co.,
973 F. Supp. 820, 824, (N.D. Ill. 1997)

Knoll Pharmaceutical Co. v. Automobile Ins. Co. of Hartford,
152 F. Supp.2d 1026, 1033 (N.D. Ill. 2001)

Belleville Catering Co. v. Champaign Marketing Place, LLC,
350 F. 3d 691 (7th Cir. 2003)

Container Supply Co. v. Fireman's Fund Ins. Co.,
712 F. Supp. 871, 872 (D. Kansas 1989)

Safeco Ins. Co. of America v. Franklin, 185 F. Supp. 499, 501 (N.D. Cal. 1960)

Martindale Lumber Co. v. Bituminous Casualty Corp., 625 F.2d 618, 620 (5th Cir. 1980)

Providence Washington Ins. Co. v. Valley Forge Ins. Co., 42 Cal. App. 4th 1194

Duval v. Midwest Auto City, Inc., 425 F. Supp. 1381 (D. Neb 1977)

Crum & Forster Managers Corp., et. a.. v. Resolution Trust Corp.,
620 N.E. 2d 1073 (Ill. 1993)

Aerojet-General Corp. v. Transport Indemnity Co., 17 Cal. 4th 38, 59 (Cal. 1997)

Gray v. Zurich, 65 Cal. 2d 263 (Cal. 1966)

Edward Gray Corp. v. Nat. Union Fire ins. Co. of Pittsburg,
1997 WL 102542 *2 (N.D. Ill. 1997)

Travelers Ins. Cos. v. Penda Corp., 974 F. 2d 823 (7th Cir. 1992)

Chandler v. Doherty, 702 N.E. 2d 634, 638 (Ill. App. 1998)

Ill. State Med. Ins. Serv., Inc. v. Cichon, 629 N.E. 2d 822, 826 (Ill.App.Ct. 1994)

Miller v. Elite Ins. Co., 161 Cal. Rptr. 322, 330 (Cal.Ct.App. 1980)

Superperformance International, Inc. v. Hartford Casualty Ins. Co.,
203 F.Supp.2d 587, 596-597 (E.D. Vir. 2002)

R.C. Bigelow, Inc. v. Liberty Mutual Ins. Co., 287 F.3d 242 (2nd Cir. 2002)

Platinum Technology, Inc. v. Federal Ins. Co., 2000 WL 875881 *5 (N.D. Ill. 2001)

Platinum Technology, Inc. v. Federal Ins. Co., 282 F. 3d 927 (7th Cir. 2002)

Poof Toy Products, Inc. v. U.S.F. & G. Company,
891 F. Supp. 1128, 1233 (E.D. MI 1995)

Central Mutual Ins. Co. v. Stunfence, Inc., 292 F. Supp.2d 1072, 1079 (N.D. Ill. 2003)

B.H. Smith, Inc. v. Zurich Ins. Co., 285 Ill.App.3d 536, 539 (1st Dist. 1996)

J.A. Brundage Plumbing & Roto-Rooter, Inc. v. The Mass. Bay Ins. Co.,
818 F. Supp. 553, 557 (W.D. NY 1993)

Industrial Molding Corp. v. American Manufacture, 17 F. Supp.2d 633, 638 (N.D. TX 1998)

Union Ins. Co. v. Knife Co., Inc., 897 F. Supp. 1213, 1215-16 (W.D. Ark. 1995)

Dogloo, Inc. v. Northern Ins. Co. N.Y., 907 F. Supp. 1383, 1389 (C.D. Cal. 1995)

Couch on Insurance § 129:28 (3d ed. Supp. Dec. 2000)

Lebas Fashion Imp. of USA, Inc. v. ITT Hartford Ins. Group,
59 Cal. Rptr. 2d 36 (Cal. Ct. App. 1996)

Advance Watch Company, Ltd. v. Kemper National Ins. Co., 99 F3d 795 (6th Cir. 1996)

American Economy Ins. Co. v. Reboans Inc., 900 F. Supp. 1246 (N.D. Cal. 1994)

Elcom Technologies, Inc. v. Hartford Ins. Co. of the Midwest, 991 F. Supp. 1294 (D.Utah 1997)

Bank of the West v. Super. Ct., 833 P. 2d 545, 560 (Cal. 1992)

Fidelity and Guaranty Ins. Co. v. Kocolene Marketing Corp., 2002 WL 977855 *10 (S.D. Ind.)

Native American Arts, Inc. v. Village Originals, 25 F. Supp. 2d 876, 880 (N.D. Ill. 1998)

Bear Wolf, Inc. v. Hartford Ins. Co. of the Southeast, 819 So. 2d 818 (Ct.App.4th 2002)

Fireman's Fund Ins. Co. of WI v. Bradley Corporation, 261 Wis2d 4, 31 (Wis S.C. 2003)

Molding v. Am. Mfrs. Mutl. Ins. Co., 17 F. Supp. 2d 633, 638 (N.D. Tex 1998)

Ben Berger & Son, Inc. v. Am. Motorist Inc. Co., 1995 WL 386560 *4(S.D.N.Y.1995)

Miller v. Elite Ins. Co., 100 Cal.App.3d 739, 754 (1980)

Ward v. Allstate Ins. Co., 964 F. Supp. 307, 312 (C.D. Cal. 1997)

Fireman's Fund Ins. Co. v. Davis, 37 Cal.App.4th 1432, 1441 (1995)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

NATIVE AMERICAN ARTS, INC.    )
an Illinois corporation, as the assignee  )
of Bloom Brothers, a division of      )
Stravina Operating Company, L.L.C.  )    Judge Kocoras
                              )
                              )
          Plaintiff,        )
                              )    Case Number 03 C 7233
      v.                   )
                              )
HARTFORD CASUALTY INSURANCE  )
COMPANY, an Indiana corporation;    )
HARTFORD INSURANCE COMPANY   )
OF THE MIDWEST, an Indiana       )
corporation; and GREAT AMERICAN  )
INSURANCE COMPANY, an Ohio      )
corporation,                 )    Jury Trial Demanded
                              )
         Defendants.     )

*FILED*
JUN 3 0 2004
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## PLAINTIFF NATIVE AMERICAN ARTS, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COMES Plaintiff Native American Arts, Inc. ("Native American Arts" or "NAA"), as the assignee of Bloom Brothers, a division of Stravina Operating Company, L.L.C., ("Bloom Brothers" or "BB"), by and through its attorneys, Michael Patrick Mullen, Scott M. Kolosso and Carla E. Buterman of the law firm of MULLEN & FOSTER, and in support of its Motion for Partial Summary Judgment on Duty to Defend states as follows:

## I.    SUMMARY

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 [c]; *See also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Here, there are no genuine issues as to any material fact and NAA is entitled to judgment as a matter of law for the following reasons.

1

First, because the underlying complaint clearly alleged facts which fall, or, at minimum, potentially fall, within the advertising injury coverage provisions of the relevant insurance policies, Hartford Insurance Company of the Midwest, Hartford Casualty Insurance Company and Great American Insurance Company abandoned and breached their duties to defend their insured, Bloom Brothers.[1] See Flodine v. State Farm Ins. Co., 2001 WL 204786 (N.D. Ill. 2001)("Flodine I")(Judge Gottschall holding, under the Indian Arts and Crafts Act, 25 U.S.C. § 305e ("IACA"), there is a duty to defend for nearly identical allegations of advertising injury as were alleged in the underlying litigation)(Exhibit 1).[2]

Second, Illinois law applies to the insurance contracts at issue here. Pursuant to Illinois law, as a result of the insurers' breach of their duties to defend BB, this Court should hold that the insurers are estopped from denying their duties to indemnify BB. Employers Ins. Co. of Wausau v. Ehlco, 186 Ill.2d 127 (Ill. 1999); See Flodine v. State Farm Ins. Co., 2003 WL 1394977 (N.D. Ill. 2003) ("Flodine II")(Judge Gottschall holding that insurer who breached its duty to defend for alleged advertising injury arising from violations of the IACA was estopped to deny its duty to indemnify) (Exhibit 2).

## II.    CONSTRUCTION OF AN INSURANCE CONTRACT

Illinois and California law are identical on all relevant substantive legal issues except estoppel.[3]

---

[1] Hartford Insurance Company of the Midwest and Hartford Casualty Insurance Company will hereinafter be collectively referred to as "Hartford" and Great American Insurance Company will be referred to as "Great American." Additionally, all three insurance companies will collectively be referred to as "insurers."

[2] "Underlying litigation" hereinafter refers to NAA v. Bloom Brothers, et. al., Case Number 01 C 5716, which was pending in the Northern District of Illinois.

[3] Under Illinois law, an insurance contract is to be liberally construed in favor of the insured and against the insurer. J.L. Simmons Co., Inc. v. Fidelity & Casualty Co., 511 F. 2d 87 (7th Cir. 1975). Any uncertainty should be resolved in favor of the insured. American Fire & Gas Co., v. Broeren Russo Const., Inc., 54 F. Supp. 2d 842 (C.D. Ill. 1999). If the terms of insurance policies are susceptible to more than one meaning, they are to be considered ambiguous, and will be construed strictly against the insurer who drafted the policy. Rosenberg v. Zurich American Ins. Co. 312 Ill. App. 3d 97 (Ill. App. 1 Dist. 2000). Where there is an ambiguity all exclusions, conditions, or provisions which tend to limit or defeat liability should be construed most favorably to the insured and the burden of showing a claim falls within an exclusion rests with the insurer. Transamerica Ins. Co. v. South, 975 F. 2d 321 (7th Cir. 1992). Application of an exclusionary clause must be clear and free from doubt, because any doubts to coverage will be resolved in favor of the insured. Insurance Co. of Illinois v. Stringfield, 292 Ill. App. 3d 471 (1st Dist. 1997). Under California law, insurance policies are to be construed, if possible, with the objective of providing coverage for loses in order to protect the insured's reasonable expectations of coverage. Consolidated American Ins. Co. v. Mike Soper Marine Services, 951 F.2d 186, 188 (9th Cir. 1991). When an insurer uses language which is uncertain and susceptible to more than one meaning, the language is ambiguous and construed against the insurer. Hartford Accident and Indemnity Co. v. Civil Service Employees Ins. Co., 108 Cal.Rptr. 737, 741 (Cal.Ct.App. 1973). Any exclusionary clause must be conspicuous, clear and plain as it will be construed strictly against the insurer and liberally in favor of the insured. Miller v. Elite Ins. Co., 161 Cal.Rptr. 322, 329 (Cal.Ct.App. 1980).

## III.  CHOICE OF LAW

Defendants have asserted that California law should apply.  However, as set forth below, such an argument is without merit and is simply a transparent attempt to avoid Illinois estoppel law.

The application of substantive Illinois and California law produces the same result on this Motion regarding the construction of the insurance policies and the determination of the insurers' duties to defend.  However, the ruling on the choice of law is important to Plaintiff because Illinois recognizes an estoppel based on a breach of the duty to defend and California appears not to adopt these same estoppel principles.  Conflict of law rules apply when application of the different state's laws will make a difference as to the decision reached. In re Air Crash Disaster, 644 F.2d 594, 605 (7th Cir. 1981).

Under Illinois law, if the Court determines that the insurers breached their duties to defend, the insurers would be obligated to indemnify BB for the full settlement value because an insurer who breaches its duty to defend is estopped from denying its duty to indemnify. Maneikes v. St. Paul Ins., 655 F.2d 818 (7th Cir.1981).  An insurer which disputes coverage must defend under a reservation of rights or promptly bring a declaratory judgment action to establish no duty.  Failure to do so results in an estoppel. A. Kush & Assoc. Ltd. v. American States Ins., 927 F.2d 929, 934 (7th Cir. 1991).  It is undisputed that neither Hartford nor Great American did either, rather they completely abandoned BB.  If the Court agrees that Illinois law applies, it would not have to consider in a subsequent motion whether a duty to indemnify exists under the policy nor would it have to consider whether any defenses to indemnification were applicable.  Instead, it would simply find that the insurers have a duty to indemnify due to their breach of their duties to defend.[4]

If California law is applied, it appears that an insurer's breach of its duty to defend, absent insurer misconduct, does not automatically result in a breach of its duty to indemnify and, as such, this Court in a subsequent motion would be required to make an additional determination regarding

---

[4] Illinois courts consider the insurer's obligation to defend under a liability insurance policy as so fundamental that a breach of the duty to defend constitutes a repudiation of the contract and a breach of its duty to indemnify. Ehlco at151. Such a philosophy encourages insurers to defend their insureds under a reservation of rights, instead of abandoning them.

whether there was duty to indemnify. <u>Sunseri v. Camperos Del Valle Stables, Inc.</u>,185 Cal.Rptr.3d

559, 561 (Cal.Ct.App. 1986).

Based on the aforementioned law, it appears as though a true conflict may exist as to the issue

of estoppel.[5] If so, the Court should make a determination as to whether Illinois or California law

applies to the estoppel issue. In this diversity of citizenship case the Court must look to the conflict of

law rules of the forum state, Illinois, to determine which state's substantive law will apply. <u>Klaxon</u>

<u>Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 496 (1941). Due to the fact that the insurance policy at

issue contains no choice of law provision, the Court must apply the factors enumerated by the Illinois

Supreme Court in <u>Lapham-Hickey Steel Corp. v. Protection Mutual Ins. Co.</u>,166 Ill.2d 520 (Ill. 1995).

**A. An analysis of the Lapham-Hickey factors favors the application of Illinois law**

Under Illinois law, the choice of law for insurance policies is governed under the most

significant contacts test. Specifically, pursuant to <u>Lapham-Hickey</u>, the Court must examine the

following six factors and determine if the balance of these factors support application of Illinois law:

(1) Location of the subject matter; (2) Place of delivery; (3) The domicile of the insured and insurer;

(4) Place of last act to give rise to a valid contract; (5) Place of performance; and (6) State bearing a

rational relationship to the general contract. <u>Lapham-Hickey</u> at 526-527. On balance, the above

factors show Illinois having the most significant contacts and support application of Illinois law and

not the law of California, Washington, Minnesota Indiana, Ohio or any other state.

In <u>Flodine II</u>, Judge Gottschall, following an extensive Lapham-Hickey analysis, held that

under very similar circumstances as here that Illinois law would apply. Also, in <u>Flodine I</u>, Judge

Gottschall clearly indicated that in addition to the Lapham-Hickey factors, that it is an important

factor if one of the jurisdictions has addressed the issue at hand. As stated by Judge Gottschall, that

issue is "whether a general commercial liability policy covers IACA violations." <u>Flodine I</u> at *5.

Here, through <u>Flodine I and II</u>, an Illinois District Court has analyzed and addressed that issue which

favors application of Illinois law, whereas a California court has never addressed that issue.

---

[5] Needless to say, if the Court does not find that a true conflict exists regarding the issue of estoppel than the Court is obligated to apply the law of the forum state, Illinois. <u>Baron v. Ford Motor Co.</u>, 965 F. 2d 195, 197 (7th Cir. 1992).

In addition, District Courts in Illinois, applying Illinois case law, have held that "the location of the underlying lawsuit may also be considered by the court in determining which state's law to apply." Flodine II at *4 citing Evangelical Lutheran Church in American et. al. v. Atlantic Mutual Ins. Co., 973 F. Supp. 820, 824 (N.D. Ill. 1997).. Here, the underlying litigation was filed and litigated for over two years in the Northern District of Illinois and, as such, this further buttresses the application of Illinois law.

Applying the Lapham-Hickey factors, as to the location of the subject matter, it is important to note that the location of the insured risk was spread out among numerous states including Illinois. Illinois courts hold that "where insurance policies cover an organization's conduct nationwide, ...the location of the insured risk is the place where the insured's liability actually arises." Id. at 824.

In Flodine II at *4, the court concluded that applying the above principles to that case:

"It is clear that Illinois is the location of the insured risk. The policy covers liability stemming from advertising injuries in Illinois. The court rejects [insurer's] argument that [insured's] liability arose during production and manufacture of her products. Rather, the liability arose when [insured's] products were advertised and sold. That liability arose in Illinois."

The policies at issue here provide coverage for advertising injury caused by BB during the course of its business. BB incurred substantial risk by actively participating in advertising activities nationwide, including in Illinois. Illinois is the only place where the relevant claims and liability arose. Therefore, this factor supports the application of Illinois law. At minimum, this factor would not favor California because the manufacture and shipping of the products at issue, at least for the first coverage period (99-00) and part of the second coverage period (00-01), was done in Washington and Minnesota where BB maintained inventories between November 6, 2000 and at least January 2001. (NAA's Uncontested Facts ¶ 80).

The next factor in favor of Illinois law is that of "Place of Performance." This factor favors the state where the claim is to be paid. BB's liability in the underlying litigation arises from its advertising activities in Illinois and the injuries those activities caused to NAA which also occurred in Illinois. Furthermore, BB's settlement payment in the underlying litigation was made in Illinois which is also where, had the insurers not abandoned their insured, the insurers would have paid any

claims to NAA. Also, if NAA prevails in the pending litigation, the insurers will pay any amounts owed to NAA in Illinois. In addition, the policies issued to BB covered its nationwide operation. Thus, clearly, the parties intended that the policy would cover claims that arose in states other than California, especially when BB's products were manufactured and shipped during the first coverage period and part of the second coverage period from Washington and Minnesota. Obviously, where a claim resulting in liability did arise in a state other then California, such as in Illinois, such a claim would be paid in that other state. *See* Knoll Pharmaceutical Co. v. Automobile Ins. Co. of Hartford, 152 F. Supp.2d 1026, 1033 (N.D. Ill. 2001)(J. Castillo holding "the place of performance could refer to any state where [insured] advertised or issued oral or written statements"). Therefore, the "Place of Performance" factor supports application of Illinois law.

The factor relating to the state bearing a rational relationship to the general contract clearly favors the application of Illinois law. Illinois, not California, is the state that bears the most rational relationship to the contract at issue here due to the circumstances that give rise to the pending litigation. As stated above, it was BB's activities in Illinois that resulted in the occurrence of an advertising injury in Illinois to an Illinois corporation, NAA. California has no rational relationship to the current dispute. The insurers may argue that the fact that Stravina Operating Company LLC was located in California supports a rational relationship to that state. However, this is not persuasive because, during at least the first coverage period and part of the second coverage period, the advertising injuries suffered by NAA in Illinois stemmed from BB's advertising activities deriving from Washington and Minnesota, not California.

In Flodine II, Judge Gottschall adopted and applied the above rationale in holding that this factor favored the application of Illinois law. Specifically, Judge Gottschall held:

"The fact that the claim and subsequent liability for which [insured] seeks indemnification arose in Illinois leads this court to conclude that Illinois bears a rationale relationship to the insurance contract...What matters is not where the products were manufactured or where the tags were affixed, but rather where they were advertised and sold. The Penney litigation, brought by an Illinois corporation operating out of Illinois, alleged injuries suffered by NAA in Illinois. Because the advertising of certain products in Illinois led to [insured's] liability in the underlying case, Illinois is the state bearing the most rationale relationship to the dispute." Id. at *5.

6

The five factors described above favor application of Illinois law.[6] The remaining Lapham-Hickey factors do not favor application of either Illinois or California law.

"Place of Domicile of Insured and Insurer" does not favor either state. In regard to the domicile of the insurers, both Hartford insurance companies are Indiana corporations while Great American is an Ohio corporation. All three companies have offices in Illinois and are licensed to do business in Illinois. The domicile of the insured, BB, at least during the first coverage period and part of the second coverage period would be Auburn, Washington. At minimum, even if the Court looked to the domicile of Stravina Operating Company, LLC, a limited liability company is a citizen of every state of which any member is a citizen. Belleville Catering Co. v. Champaign Marketing Place, LLC, 350 F.3d 691 (7th Cir. 2003). Here, the Defendants have failed to show that any, much less all, of Stravina's members are citizens of California.

The factor regarding "Place of last act to give rise to a valid contract" is of no help because premium payments undoubtedly made their way to states other than Illinois or California, specifically, the domiciles of the insurers which are Indiana and Ohio.

The "Place of Delivery" factor does not favor either Illinois or California and is therefore of no help here. Presumably, the policies were delivered to the insured's place of business. As pointed out above, this factor is of little help because at least the first policy and, most likely, the second policy would have been delivered to BB in Auburn, Washington.

In summary, Illinois law should be applied because Illinois is the place where the violative conduct and injuries resulting therefrom occurred as well as where the victim resides. That means Illinois has the most significant contacts to this cause of action. Illinois is the location of the subject matter, the place of performance, the location of underlying litigation, and the only jurisdiction to have addressed the pending coverage issue. Also, most importantly, Illinois clearly bears the most rational relationship to the contract at issue because BB's activities in Illinois resulted in advertising

---

[6] In addition, the District Court for the Northern District of Illinois has jurisdiction to enforce the settlement agreement, including the assignment of claims against the insurers, and enforce the agreed order from the underlying litigation. Both the settlement agreement and agreed order apply Illinois law.

injuries in Illinois to an Illinois corporation. Just as in <u>Flodine II</u>, these factors support Illinois law. The remaining factors are split between Washington, Minnesota, Ohio, Indiana, and California.

## IV.     THE RELEVANT INSURANCE POLICIES

There are three coverage periods which are at issue in the pending Motion which are November 22, 1999 to November 22, 2000 ("99-00"); November 22, 2000 to November 22, 2001 ("00-01"); and  November 22, 2001 to November 22, 2002 ("01-02").  Within each of these three coverage periods there are both primary insurance policies and excess insurance policies at issue. Hartford Insurance Company of the Midwest issued all three of the primary policies (See Exhibits 7, 8 and 9; 99-00, 00-01, and 01-02 respectively).  Hartford Casualty Insurance Company issued two excess policies for the coverage periods of 99-00 and 01-02. (See Exhibits 10 and 11; 99-00 and 01-02, respectively).  Great American Insurance Company issued one excess policy for the coverage period of 00-01. (See Exhibit 13; 00-01).[7]

Hartford and Great American were obligated to defend BB for any advertising injury to which their policies applied.  As fully set forth in NAA's Uncontested Facts paragraphs 40 to 67 and incorporated herein, Hartford's primary and excess policies and Great American's excess policy provided coverage for advertising injury arising out of BB's advertising activity.

### A.  Bloom Brothers was a named insured under all relevant policies

BB was a named insured under all the relevant policies. (See NAA's Uncontested Facts ¶'s 42-46 and 56-58).  However, a purported basis for Hartford's and Great American's declination of their duties to defend BB was that BB was not listed as an "insured" under the 99-00 and 00-01 policies.[8] (See Exhibits 36, pg. 2, and 38, pg. 7, Hartford's and Great American's declination correspondence, respectively).  Such an assertion is entirely without merit, blatantly contradictory to endorsements

---

[7] In each coverage period, both the primary and excess policies are triggered based upon NAA's settlement with BB in the underlying litigation which consisted of a cash payment amount of $150,000 plus a settlement value of $3,000,000 for the assignment of claims of indemnity based upon three policy years against BB's insurers for a total of $3,150,000 plus attorneys fees. BB had, at minimum, $1,000,000 in primary advertising injury coverage during each of the three applicable policy years and had either an additional $2,000,000 or $10,000,000 in excess advertising injury coverage each year.
[8] Defendant Hartford does admit that BB was an insured under the 00-01 and 01-02 policies. See Exhibit 36, pg. 2.

contained in the policies, and the insurers attempt to mislead their insured by asserting that BB was not covered constitutes insurer misconduct.

In Hartford's July 17, 2003 declination letter to BB, Hartford stated the following:

"For coverage under the CGL policy, you must first have an 'insured.' The following are the entities listed as 'Named Insureds' via endorsements on each policy respectively:

The 99-00 policy names: Stravina Operating Company LLC d/b/a Funworks and d/b/a On the Road.

The tendering party and named Defendant in this lawsuit is: Bloom Brothers, a division of Stravina Operating Company LLC. For the 99-00 policy period Stravina-Bloom is not listed as a 'named insured.'"

There are four independent basis which establish that BB was a named insured under Hartford's 99-00 policy. First, because Stravina Operating Company, LLC is listed as a named insured under the policy that would entitle all its divisions or d/b/a's, including BB, to coverage under the policy.[9]

Second, under the 99-00 policy, BB would be an insured because the policy provides in Section II (4) – WHO IS AN INSURED that "Any organization you newly acquire or form, ...and over which you maintain ownership or control will qualify as a Named Insured if there is no similar insurance available to that organization." Under Section II (4)(a), coverage under this provision is afforded until the 180th day after you acquire or form the organization or the end of the policy, whichever is earlier.[10]

Here, Stravina acquired the assets of BB on 11-6-2000 and formed a new organization. At the time of acquisition and formation, BB had no insurance. Thus, under the terms of Hartford's policy,

---

[9] "A corporation is a single entity in contemplation of the law, and, although it may have many departments, or subdivisions, being a corporation it is an indivisible unit. Consequently, insurance applicable to the corporation as a whole naturally extends to an indivisible part of the whole." Container Supply Co. v. Fireman's Fund Ins. Co., 712 F. Supp. 871, 872 (D. Kansas 1989) citing Safeco Inc. Co. of America v. Franklin, 185 F. Supp. 499, 501 (N.D. Cal. 1960) and Martindale Lumber Co. v. Bituminous Casualty Corp., 625 F. 2d 618, 620 (5th Cir. 1980). This concept also applies if BB is considered a d/b/a of Stravina. A d/b/a is simply a fictitious business name under which the company operates. "An insured must be a legal person, such as an individual, partnership or corporation. The designation 'd/b/a' means 'doing business as' but is merely descriptive of the person or corporation who does business under some other name. Doing business under another name does not create an entity distinct from the person operating the business." Providence Washington Ins. Co. v. Valley Forge Ins. Co., 42 Cal. App. 4th 1194 citing Ins. Code § 151 and Duval v. Midwest Auto City, Inc., 425 F. Supp. 1381 (D.Neb. 1977).

[10] The 99-00 policy actually provides for a 90 day period however, the Special Broad Form Commercial Liability Endorsement ¶ 12(a), which is part of said policy, extends this time period to 180 days.

Hartford was obligated to provide coverage for BB starting on 11-6-2000 until the end of 99-00 policy period.

Third, Hartford's 99-00 policy has a named insured endorsement which specifically lists "Fason Souvenir and Novelties" as a named insured. (See Exhibit 7, Hartford bate-stamp number H00581). In the 00-01 policy endorsement, BB is listed as a d/b/a of "Fason Souvenir and Novelties." (See Exhibit 8, Hartford bate-stamp number H00782). Therefore, based on the authority set forth in footnote 9, the listing of a d/b/a is not necessary to establish coverage so long as the company is listed. Since, according to Hartford's 00-01 policy, BB was a d/b/a of Fason Souvenir and Novelties it was not necessary to list BB as a named insured in the 99-00 policy in order for BB to be covered because Fason Souvenir and Novelties was listed as a named insured during the 99-00 coverage period.

Finally, because BB was acquired only two weeks prior to the end of the 99-00 coverage period it is reasonable that Hartford would not have issued a separate endorsement listing BB as a named insured.

Great American also incorrectly contended that BB was not a named insured under the 00-01 policy. However, just as with Hartford, there is a policy endorsement which adds BB as a named insured on said policy. (See Exhibit 13, bate-stamp number GA0071). In addition, Great American's policy also provides that a named insured includes "any person or organization of which Stravina owns more than 50%, as of the effective date of the policy." The effective date of Great American's excess policy is 11-22-2000. (NAA's Uncontested Facts ¶ 61). After 11-6-2000, Stravina owned more than 50% of the assets of BB.

## V.    STANDARD FOR DUTY TO DEFEND

Under Illinois and California law, an insurer's duty to defend its insured in a lawsuit is broader than its duty to indemnify. Crum & Forster Managers Corp., et. al. v. Resolution Trust Corp., 620 N.E.2d 1073 (Ill. 1993); Aerojet-General Corp. v. Transport Indemnity Co., 17 Cal. 4th 38, 59 (Cal. 1997). To determine whether an insurer has a duty to defend, courts compare the allegations of the underlying complaint with the relevant coverage provisions. If the facts alleged in the underlying

complaint fall within, or potentially within, the coverage provisions, then the insurer must defend the insured in the underlying action. Crum at 613-614; Gray v. Zurich, 65 Cal. 2d 263 (Cal. 1966). An insurer may not justifiably refuse to defend an action against its insured unless it is *clear* from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage. Edward Gray Corp. v. Nat. Union Fire Ins. Co. of Pittsburg, 1997 WL 102542 *2 (N.D. Ill. 1997)(J. Kocoras) *citing* Travelers Ins. Cos. v. Penda Corp., 974 F. 2d 823 (7th Cir. 1992)(emphasis in original). In determining whether an insurer has a duty to defend the court is limited to comparing the allegations of the complaint with the insurance policy. Chandler v. Doherty, 702 N.E. 2d 634, 638 (Ill.App. 1998). The allegations of the underlying complaint must be construed liberally and any doubt as to coverage must be resolved in favor of the insured. Ill. State Med. Ins. Serv., Inc. v. Cichon, 629 N.E. 2d 822, 826 (Ill. App. Ct. 1994); Miller v. Elite Ins. Co., 161 Cal. Rptr. 322, 330 (Cal.Ct.App. 1980).

## VI.    THE ALLEGATIONS

The underlying complaint alleged advertising activity on the part of BB. NAA's Amended Complaint, Exhibit 32, alleged the widespread marketing, advertising, solicitation, display, offer and sale over a two and a half year period of numerous goods falsely suggested to be Indian-made at numerous locations in the Chicagoland area. Among other allegations, NAA's complaint alleged the following in regard to BB's advertising activity and advertising injuries suffered by NAA resulting therefrom:

"[]Bloom Brothers, a division of Stravina Operating Company, LLC, is a wholesaler, manufacturer and/or supplier engaged in the offering, displaying for sale and selling arts, crafts and jewelry products, including but not limited to products in a traditional Indian style motif and design, to various retailers and wholesalers throughout the United States and in the Northern District of Illinois." Am.Cmplt.¶ 5

"[...]Defendants have directly and indirectly offered, displayed for sale and sold multiple quantities of various goods in a manner that falsely suggests they are Indian produced, an Indian product, or the product of a particular Indian or particular Indian tribe or Indian arts and crafts organization resident within the United States, including Indian products consisting of artworks, crafts, and jewelry in a traditional Indian style or medium, in violation of the IACA, Title 25 U.S.C. § 305 et. seq. § 305 e, and the regulations promulgated thereunder." Am. Cmplt. ¶ 9

"[...]*Defendants advertised, marketed, offered and displayed for sale and sold goods directly or indirectly on the Internet in a manner that falsely suggested they are an Indian product,* Indian produced or the product of an Indian arts and crafts organization resident within the United States, including Indian products consisting of artworks, crafts and jewelry in a traditional Indian style or medium." (Emphasis added) Am. Cmplt. ¶ 10

"[...]*Defendants advertised, marketed, offered and displayed for sale and sold goods directly or indirectly arising from the nationwide dissemination of catalogs, brochures, and sales literature which advertised, marketed, offered and displayed for sale and sold goods in a manner that falsely suggested they are an Indian product,* Indian produced or the product of an Indian arts and crafts organization resident within the United States, including Indian products consisting of artworks, crafts and jewelry in a traditional Indian style or medium." (Emphasis added) Am. Cmplt. ¶ 11

"Defendants' advertisement and nationwide dissemination of catalogs, brochures, and sales literature included but was not limited to the distribution of said materials via mailing lists, Internet requests and distribution of catalogs at gift and trade shows." Am. Cmplt. ¶ 12

"[...]*Defendants advertised, marketed, offered and displayed for sale and sold goods directly or indirectly arising from nationwide attendance of gift and trade shows...in a manner that falsely suggested they are an Indian product,* Indian produced or the product of an Indian arts and crafts organization resident within the United States, including Indian products consisting of artworks, crafts and jewelry in a traditional Indian style or medium." (Emphasis added) Am. Cmplt. ¶ 13

"The products alleged herein are traditional Indian products embodying traditional Indian styles, motifs and designs, traditionally made by Native Americans, and were falsely suggested to be Indian-made Indian products and these products were advertised, marketed, and sold as such, including advertising and marketing these products with other Indian style products expressly represented to be Indian products, or Indian, or Native American made." Am. Cmplt. ¶ 17

"A substantial portion of the products displayed for sale by Defendants did contain attached tags of the kind displayed on the Exhibits herein using unqualified terms "Indian", "Native American" and references to named Indian tribes." Am. Cmplt. ¶ 21

*"The tags attached to Defendants products are advertisements and constitute advertising activity."* (Emphasis added) Am. Cmplt. ¶ 22

"[...]*Defendants advertised, marketed, offered and displayed for sale and sold goods directly or indirectly in a manner that falsely suggested they are Indian-made,* an Indian product, a product of an Indian tribe or the product of an Indian arts and crafts organization resident within the United States, including Indian products consisting of artworks, crafts and jewelry in a traditional Indian style or medium." (Emphasis added) Am. Cmplt. ¶ 23

*"Defendants' advertisement, display, offering for sale and sale of Indian style goods* in a manner that falsely suggests they are Indian products, Indian produced or the product of a particular Indian or Indian tribe or Indian arts and crafts organization resident within the United States is illegal and should be enjoined in that no adequate remedy at law exists and Plaintiff will be irrevocably injured and damages will be difficult to measure." (Emphasis added) Am. Cmplt. ¶ 25

*"Native American Arts has been injured and damaged as a result of Defendants' actions alleged herein.* Native American Arts is a competitor of Defendants and has suffered competitive injuries as a

result of Defendants' actions alleged herein, as well as other damages. *Native American Arts advertises, markets and sells authentic Indian-made products similar to those products advertised, offered, displayed and sold by Defendants falsely suggested to be Indian products,* including but not limited to arts, crafts, artworks and jewelry in a traditional Indian style or medium including designs involving dreamcatchers, mandellas, medicine wheels, shields, Kachinas, feathers, animal fetishes, Indian fetishes, bear claw designs, bear design, Kokopelli and other Indian products." (Emphasis added) Am. Cmplt. ¶ 26

*"The injuries suffered by Native American Arts, Inc. include, but are not limited to, advertising injury arising out of Defendants' misappropriation of Native American Art, Inc.'s advertising ideas and style of doing business."* (Emphasis added) Am. Cmplt. ¶ 27

*"The injuries suffered by Native American Arts, Inc. include, but are not limited to, advertising injury arising out of Defendants' infringement of title by falsely suggesting and misrepresenting that their products were Indian made when they were not."* (Emphasis added) Am. Cmplt. ¶ 28

The allegations above derive from BB's advertising and marketing activity done to induce the sale of their falsely suggestive Indian-made goods. As alleged, BB advertised and marketed the products at issue in the underlying complaint through the internet and various catalogs, magazines, brochures and flyers which were distributed nationally via mailing lists and attendance at trade and gift shows throughout the United States. These advertising and marketing mediums depicted many different Indian style motifs and designs which falsely suggested the products were Indian-made and made repeated unqualified reference to "Native Americans" and "Indians." Additionally, as alleged, BB advertised and marketed its products through the attachment of backing cards to the products some of which are marked "Indian Dream Catcher"(Am. Cmplt. Exhibit WW) and others which make unqualified reference to "Native American," "Indian," and to the "Apache," "Seri" and "Sioux" Indian tribes. As alleged in the Amended Complaint ¶'s 19 – 22, use of such advertising and marketing language which uses the unqualified terms Native American, Indian, or the name of an Indian tribe is a representation that the product is Indian-made and, if false, is a violation of the IACA and regulations promulgated thereunder.

The IACA, as a consumer protection statute which prohibits falsely suggesting products are Indian-made, presumes advertising, marketing and sales as the area of regulation. It is implicit in the IACA and in pleading a violation of the IACA that such advertising will occur. As such, it is the marketing and advertising of the products as Indian-made which violates the IACA, not the products

themselves. It is that marketing and advertising alleged in the underlying complaint which triggers the duty to defend.[11]

Clearly, the allegations in the underlying litigation against BB included the widespread advertising and marketing of products falsely suggested to be Indian-made. The underlying complaint even alleges that NAA suffered an advertising injury as a result of such advertising activity including a misappropriation of NAA's advertising ideas and style of doing business as well as infringement of title. Individually, and collectively, these allegations triggered the insurers' duties to defend.

It is important to point out to the Court that Hartford has been confronted with similar allegations as set forth above and in those two instances Hartford defended their insured, took part in settlement discussions, and full participated to settle the matter. In fact, one of those two other insureds whom Hartford defended **was a defendant in Case Number 01 C 1618 with Artistic Impressions**, i.e., Funky Fiber Works. In both cases, Case Number 01 C 1618 and NAA v. Barry Owen, Inc., Case Number 01 C 5873, Hartford recognized its duty to defend was triggered by nearly identical allegations of advertising injury as those alleged against BB and yet, here, they inappropriately chose to abandon their insured. Presumably, because Hartford concealed that BB was a named insured and/or anticipated more substantial damages flowing from BB's activities as opposed to Hartford's other insureds. *See also* NAA's Uncontested Facts ¶ 79)(Hartford's claims notes stating that this will be a "very expensive case to litigate").

## VII.  ALLEGATIONS IN THE UNDERLYING COMPLAINT FALL WITHIN, OR POTENTIALLY WITHIN, THE RELEVANT COVERAGE PROVISIONS RELATING TO ADVERTISING INJURY

The allegations in the preceding paragraph clearly set forth claims that are within, or potentially within, the advertising injury provisions of the relevant insurance policies. Specifically, as set forth supra, NAA alleged copying or misappropriation of NAA's advertising ideas, style of advertisement, style of doing business, and an infringement of title by BB.

---

[11] Allegations of violations of the IACA, like the Lanham Act, inherently involve advertising activity. Poof Toy at 1235-1236 ("[A]llegations of trademark and trade dress infringement inherently involve advertising activity. In other words, there can be no trademark/trade dress infringement without advertising having occurred").

**A. Allegations of copying a person's or organization's advertising idea or style of advertisement are synonymous with misappropriation of a person's or organization's advertising idea or style of doing business**

As a preliminary matter, it is important to point out that Hartford's policies contain an uncommon definition of advertising injury.(NAA's Uncontested Facts ¶'s 47-52, 59 and 60). However, as various courts have decided, application of Hartford's definition is the same as the customary definition of advertising injury.

The definition of advertising injury in the Hartford policies contains the following language: "Copying in your 'advertisement' a person's or organization's 'advertising idea' or style of 'advertisement.'" This language differs slightly from the customary definition of advertising injury contained in most commercial general liability policies. The customary definition of advertising injury, which is also the definition used in Great American's excess policy, is as follows: "Misappropriation of a person's or organization's advertising idea or style of doing business."

The difference, if any, between the two definitions is inconsequential. Case law applicable to one definition is equally authoritative as to the other. For example, in the analogous context of trade dress infringement, a court held, in rejecting Hartford's argument that "misappropriation jurisprudence is inapplicable to the present case because the Policy employs slightly different language,"..."that an offense of trade dress infringement is properly contained within the Policy's coverage for 'copying in your advertisement, a person's or organization's advertising idea or style of advertisement." Superperformance International, Inc. v. Hartford Casualty Ins. Co., 203 F.Supp.2d 587, 596-597 (E.D. Vir. 2002); *See also* R.C. Bigelow, Inc. v. Liberty Mutual Ins. Co., 287 F.3d 242 (2nd Cir. 2002)(Second Circuit holding that identical Hartford advertising injury definition provides coverage for trade dress infringement same as misappropriation definition).

In this memorandum, NAA refers to "copying in your advertisement a person's or organization's advertising idea or style of advertisement" as well as "misappropriation of a person's or organization's advertising idea or style of doing business." As stated, these definitions can be used

interchangeably and arguments, authority, and allegations regarding, or containing, one definition would apply to the other.

### B. Allegations of advertising injury for copying NAA's style of advertisement

Allegations of marketing and advertising of products, which violate the IACA prohibition of not falsely suggesting products are Indian-made, trigger a duty to defend. In determining that such a duty to defend existed for claims under the IACA, in <u>Flodine I and II</u>, Judge Gottschall specifically held that such allegations constitute "advertising injury" under a commercial liability policy. In reaching her conclusion, Judge Gottschall relied upon the understanding that allegations of a violation of the IACA are directly analogous to claims under the Lanham Act for trademark or trade dress infringement, which the majority of cases hold is a copying or misappropriation of advertising ideas, style of doing business, style of advertisement or infringement of title. In <u>Flodine I</u> at *6, Judge Gottschall held:

"Flodine argues (correctly in this court's judgment) that the claims in the underlying complaint are analogous to claims for trademark or trade dress infringement. The IACA protects Indian sellers of arts and crafts by preventing non-Indians from exploiting the market value and good will associated with authentic, Indian-made products; this also benefits consumers who prefer authentic goods and are willing to pay more for them. Not only do violators of the IACA trade upon a reputation or advantage that they did not earn, but they take sales away from those who may rightfully capitalize on the fact that a product is Indian-made. As Judge Manning observed in a case similar to the underlying Ho-Chunk/Penney action, the IACA's 'false suggest' clause 'was intended to be construed as parallel and analogous to the Lanham Act...'"

The majority of cases hold that allegations of trademark or trade dress infringement are allegations of the advertising injury of "misappropriation of style of doing business." Courts "have consistently held that, while 'trademark infringement' is not listed as an offense under 'advertising injury,' it is still an 'advertising injury' covered by that section of the policy." <u>Platinum Technology, Inc. v. Federal Ins. Co.</u>, 2000 WL 875881 *5 (N.D. Ill. 2001)(Exhibit 3)(Aff'ed on appeal) 282 F. 3d 927 (7th Cir. 2002).[12] [13]

---

[12] A complaint for "trademark and trade dress infringement constitute an 'advertising injury' under the enumerated definition 'misappropriation of advertising ideas or style of doing business." <u>Poof Toy Products, Inc. v. U.S.F.&G Company</u>, 891 F. Supp. 1128, 1233 (E.D. MI 1995); *see also* <u>Central Mutual Ins. Co. v. Stunfence, Inc.</u>, 292 F. Supp.2d 1072, 1079 (N.D. Ill. 2003)(J. Shadur holding "a trademark easily qualifies as an 'advertising idea' under the line of analysis exemplified in *Flodine* and *Winklevoss*"; <u>B.H. Smith, Inc. v. Zurich Ins. Co.</u>, 285 Ill.App.3d 536, 539 (1st Dist.1996)(misuse of another's trademark constitutes misappropriation of style of doing business); <u>J.A. Brundage</u>

Trademarks are recognized by the consuming public who associate a value to the product based on the development of the trademark. A person who infringes a trademark attempts to trade off the value and good will of the trademark. When a person copies a trademark or trade dress by offering products with a deceptively similar mark or characteristic, that person is in effect palming off their goods as those of another and are misappropriating the legitimate trademark holder's style of advertisement or style of doing business. The IACA, like the Lanham Act, prohibits people from passing off their goods as Indian-made. The Lanham Act targets the use of another's trademark or trade dress, while the IACA targets entities trying to pass off imitation Indian products as authentic Indian-made Indian products.

Allegations of a violation of the IACA are copying of a style of advertisement or misappropriation of a style of doing business, just as are allegations of trademark infringement. NAA is in the business of selling authentic Indian-made Indian products. The core concept or strategy of NAA's style of advertisement is that it sells only authentic Indian-made products and emphasizes this fundamental point in all its advertising and marketing operations. The purpose of the strategy is to have the consuming public associate NAA with authentic Indian-made products. NAA attaches

---

Plumbing & Roto-Rooter, Inc. v. The Mass. Bay Ins., Co, 818 F. Supp. 553, 557 (W.D.NY 1993)(vacated due to settlement) (misappropriation of style of doing business includes trademark, trade name or service infringement); Industrial Molding Corp. v. American Manufacture, 17 F.Supp.2d 633, 638 (N.D. TX 1998) (style of doing business same as the concept of trade dress within the clause). Union Ins. Co. v. Knife Co. Inc., 897 F. Supp. 1213, 1215-16 (W.D. Ark. 1995)(passing off and trademark infringement constitute misappropriation of style of doing business). Dogloo, Inc., v. Northern Ins. Co. N.Y. 9o. N.Y. 907 F. Sup, 1389 (C.D.Cal.1995)(Style of doing business includes trade dress infringement). *Also see*, as cited in Flodine I at *7, Couch on Insurance § 129:28 (3d ed. Supp. Dec. 2000) and Lebas Fashion Imps. of USA, Inc. v. ITT Hartford Ins. Group, 59 Cal. Rptr. 2d 36 (Cal. Ct. App. 1996). A minority view that allegations of trademark infringement do not qualify as allegations of misappropriation of style of doing business is represented by Advance Watch Company, Ltd. v. Kemper National Ins. Co., 99 F.3d 795 (6th Cir.1996). However, this opinion has for the most part been distinguished and criticized, including by Judge Gottschall in Flodine I at *7-11 citing other Illinois courts, for taking too narrow a view of misappropriation of style of doing business(only applies to the common law tort of misappropriation). Lebas at 566; *See also* Industrial Molding at 639 and Stunfence at 1079. Additionally, in distinguishing Advance Watch, the Second Circuit in R.C Bigelow, Inc. at 247, a case involving an advertising injury definition utilizing "copying," held that "the term 'copying' does not suggest a traditional tort that can so readily be considered distinct from trademark or trade dress infringement."

[13] The Hartford policies do have a narrow exclusion which define advertising injury which precisely mirrors the language of the Lanham Act and precludes coverage for advertising injury arising out of "Infringement of trademark, trade name, service mark or other designation of origin or authenticity." NAA does not dispute that Hartford's policies would not cover advertising injuries arising from trademark or trade dress infringement however that has no effect on the general applicability of trademark or trade dress infringement cases to the discussion of advertising injury coverage for IACA claims. As Judge Gottschall did in Flodine I and II when she ruled there was coverage for advertising injury under the IACA, this Court should look to the trademark and trade dress advertising injury cases for guidance in its coverage determination.

17

advertising cards to all their products, which state that the product is Indian-made and identifies the maker and tribal affiliations. NAA's strategy of selling its products as "Indian-made" is its style of advertisement. (See Am. Cmplt. ¶'s 58 and 59 and NAA's Uncontested Facts ¶ 76). By pursuing such a style of advertisement, NAA is able to obtain full value from the consuming public for their authentic Indian-made products.

Under the IACA, Indians and members of the protected Indian class alone can make products advertised and marketed as Indian-made. This protection of Indians under the IACA is comparable to the protection offered to a trademark owner, that others cannot use and profit from the trademark or palm off their products as those of the trademark owner. The IACA is a consumer protection statute designed to prevent false and misleading marketing and advertising of Indian-style goods.

Under the IACA, BB cannot falsely suggest that its products are Indian-made when they are not. As alleged, BB's catalogs, brochures, flyers, internet website and advertising materials attached to the products did just that. BB offered and sold these products through the aforementioned advertising methods to NAA and the consuming public, thereby falsely suggesting that the products were Indian-made. BB's actions inflicted an advertising injury on NAA because BB copied NAA's advertising ideas and style of advertisement, specifically offering for sale and selling products as "Indian-made" nationwide, including various locations in Illinois. BB had no right to sell or advertise the products at issue as Indian-made because Indians did not make the products. The actions of BB were an attempt to capitalize on the value of advertising and marketing a product as "Indian-made." This is, just as Judge Gottschall held in <u>Flodine I and II</u>, a copying of NAA's style of advertisement which triggers a duty to defend.[14]

---

[14] Two analogous cases are <u>Elcom Technologies, Inc. v. Hartford Ins. Co. of the Midwest</u>, 991 F.Supp. 1294 (D.Utah 1997) and <u>B.H. Smith</u>. In <u>Elcom</u>, the court determined that Phonex's strategy of marketing it's phone as the only patented wireless telephone jack on the market was "part of Phonex's style of doing business." <u>Id</u>. at 1297. The court went on to hold that when Elcom began making the very same claims about it's product, Elcom usurped from Phonex their "style of doing business." <u>Id</u> at 1297-1298. In <u>B.H. Smith</u>, the court determined that "Smith copied Claiborne's style of doing business because it sold handbags that were strikingly similar to Claiborne's." <u>B.H. Smith</u> at 539.

**C. Allegations of advertising injury for copying NAA's advertising ideas**

The Amended Complaint also alleges copying and misappropriation of NAA's advertising ideas. (See Am. Cmplt. ¶'s 26 and 27). Hartford's policies broadly define "advertising idea" as "any idea for an 'advertisement." This means, under Hartford's definition of "advertisement," that an "advertising idea" is "any idea which has the purpose of inducing the sale of goods, products or services through…any… publication that is given widespread public distribution." Since Great American has a following form endorsement, the aforementioned language would also apply to Great American's policy.

As stated in the preceding section and incorporated herein, the conduct complained of by NAA is the attempt by BB to take NAA's manner of advertising its goods as authentic Indian-made. BB's purpose in doing so is induce the sale of their goods by adding the undeserved value associated with advertising goods as authentic Indian-made. As such, BB is copying NAA's advertising idea. The allegations made in the underlying complaint are analogous of claims for trademark or trade dress infringement. (Misuse of another's trademark or trade name is misappropriation of an "advertising idea." Union at 1216; JA Brundage at 557). Therefore, they qualify as advertising injury for the copying of NAA's advertising ideas.

**D. Allegations of advertising injury for infringement of title**

NAA alleged the passing off of goods under the designation or descriptive heading of Indian-made. (See Am. Cmplt. ¶'s 26 and 28). NAA is entitled to use such a descriptive headings or designation. BB is not entitled to use this designation as it is false.

Use of another's method of designating its products through a distinguishing name or general heading or descriptive designation is infringement of title. American Economy Ins. Co. v. Reboans Inc., 900 F. Supp. 1246 (N.D. Cal. 1994). In looking at policy language identical to that at issue here, the court in Reboans noted that the term "infringement of title or slogan" was not defined, and therefore would be interpreted according to the insured's reasonable expectations. The court held that, it was "objectively reasonable" for the insured to expect that the meaning of "infringement of title"

would encompass "use of anothers name or designation in an advertisement, whether or not the name or designation was a trademark." Id. at 1252. The court went on to reason that the counterfeiting or copying of []'s marks and logo falsely "designates that such merchandised distributed and sold by defendants originates from, or is otherwise associated with, []." Reboans at 1254. For these reasons, the court found the underlying complaint alleged infringement of title and, therefore, the insurer had a duty to defend.[15]

The allegations by NAA against BB allege false labeling and misrepresentation of the products at issue through advertisements to the consuming public and that BB attempted to pass their goods off as authentic Indian-made products. These allegations of passing off and of falsely suggesting products were Indian-made when they were not, are allegations that BB falsely designated that their products were associated with, or made by, Native Americans. As in Reboans, such false designation or association is infringement of title and qualifies for coverage under the insurance policies. At minimum, NAA's specfic allegations of infringement of title contained in the Am. Cmplt. ¶'s 26 and 28 trigger a duty to defend.

## VIII. ADVERTISING ACTIVITY CAUSED NAA'S ADVERTISING INJURIES

As set forth above, in the underlying litigation, NAA clearly alleged advertising activity by BB which was covered or, at minimum, potentially covered by the relevant policies. Also as alleged, said advertising activity caused advertising injuries to NAA (See Am. Cmplt. ¶'s 26-28). In the present context, one must establish a requisite causal nexus between the advertising injury and the advertising activity, i.e., the injury for which coverage is sought must be caused by the advertising offense itself rather than by some other wrongful act, and it must result from the advertising activity involved rather than from other causes. Flodine I at *9 citing Bank of the West v. Super. Ct.,833 P. 2d 545 (Cal.1992).

---

[15] "Numerous courts have concluded that a trademark or trade dress infringement claim comes within the offense of 'infringement of ..title." Fidelity and Guaranty Ins. Co. v. Kocolene Marketing Corp., 2002 WL 977855 *10 (S.D. Ind.)(Citations Omitted). See also Poof Toy at 1234 citing Reboans and P.J. Noyes at 494-495 ("the allegation that [] used the name 'Dustfree Precision Pellets' in the advertising, literature, and packaging, arguably falls within the ambit of ...infringement of..title").

In Flodine I, the court, in determining that the causal nexus requirement had been met and that duty to defend existed under nearly identical allegations of advertising activity and advertising injury, held:

"The underlying complaint alleges that Ho-Chunk and NAA were harmed when Flodine's goods were advertised and marketed in a way that falsely suggested that the goods were Indian-made. This false suggestion occurred in the course of Penney's public promotion of Flodine's products, which is alleged to have included 'advertising' and display in the Penney's catalogue...[and]...arising from Flodine's advertising activity: attaching tags to goods that presumably would be distributed to stores and displayed nationwide...tags functioned as mini-ads that were tied to the products, clearly promotional in nature yet distinct from the products themselves.

Ho-Chunk and NAA do not challenge the manufacture and sale of 'Southwestern-style' arts and crafts. Rather, their complaint concerns the manner in which Penney and Flodine marketed and advertised those products: a manner which created a false impression that the products were authentic Indian-made goods. In *NAA v. Village Originals*, the court rejected claims that the IACA regulates the content of crafts or prohibits utilization of 'Southwest' designs that resemble Native American design: to the contrary, IACA does not restrict the artistic quality of defendant's merchandise. Rather, it merely regulates the means through which such merchandise is marketed. 25 F. Supp. 2d 876, 880 (N.D. Ill. 1998).[16] (Footnote added).

The court finds that the underlying complaint arguably alleges that an injury occurred in the course of advertising Flodine's products, in the actions of both Penney [catalogues] and Flodine [tags]." Id. at *10

Here, Hartford's policies provide: "Advertisement' means a dissemination of information or images that has the purpose of inducing the sale of goods, products, or services through... [A]ny ...publication that is given widespread public distribution.[17]

The Am. Cmplt. at ¶'s 11 and 12 allege that BB used catalogs, brochures and other advertising and marketing methods to sell the products at issue. In addition, ¶'s 21 and 22 allege that advertising cards were attached to the products at issue, which falsely suggested the products were Indian-made. Also, ¶'s 10, 12, and 13 allege advertising and marketing of the products at issue through the internet and attendance are trade shows. Clearly, BB's use of catalogs, brochures, and other flyers which reference Native Americans and Indians was done to promote their products and induce the sale of

---

[16] In addition to Village Originals, six other Northern District of Illinois courts have held that the IACA merely regulates misleading commercial speech in marketing and advertising Indian-style products. See NAA's Uncontested Facts ¶ 79).
[17] The 01-02 policy was amended to provide "advertising injury" means "copying...on your website...a person's or organizations' advertising idea or style of advertisement" and that an "advertisement" means "widespread public dissemination of information or images that has the purpose of inducing the sale of goods... through... the Internet."

those products. Also, the attachment of cards to the BB products at issue, which also reference Native Americans, Indians and specific Indian tribes, were also added to induce the sale of those products. There is no other reasonable explanation.[18]

It is clear from the underlying complaint that the aforementioned advertising activities caused the advertising injuries to NAA. The advertising injuries complained of here, just as in <u>Flodine</u>, are the copying and misappropriation of NAA's style of advertisement, it's advertising ideas, and infringement of title through BB's advertising, marketing, offer, display, and sale of products as Indian made when they were not. The injury to, and impact on, NAA, as a competitive seller of Indian-style products in Illinois and the Chicagoland area, occurs directly from the false marketing and advertising that BB's products were Indian-made. NAA's Amended Complaint specifically alleged such injuries at ¶'s 27 and 28.(See also ¶ 26). Such allegations are sufficient to satisfy the requisite casual connection and trigger an insurer's duty to defend.

Additionally, BB's aforementioned advertising activity would constitute "publications that are given widespread public distribution" because, just as in <u>Flodine</u>, BB distributed its catalogs, brochures, and flyers nationwide including to various customers in Illinois; attached advertising and marketing tags to products which were offered, distributed and sold nationwide including in Illinois; attended trade and gift shows throughout the United States further distributing their catalogs, brochures, flyers and products with attached advertising and marketing tags; and maintained an internet website which provided a link to Stravina's website through which customers could order catalogs, brochures and flyers.[19]

---

Regardless of the amendment, in prior policies, BB's use of the internet to promote its products would qualify as "any publication that is given widespread distribution."

[18] Based upon the Affidavit of Mr. Jeffrey King, a independent sales representative who worked for BB from January, 2001 to August 31, 2001, BB was offering, displaying for sale and selling Indian products including Indian dreamcatchers, headdresses, tomahawks, dance bells and spears, to various BB customers in Illinois (Affidavit of Mr. Jeffrey King is attached hereto as Exhibit 39). In addition, discovery in the underlying litigation revealed that BB was distributing its catalogs and other advertising materials to at least twenty-seven (27) different retail locations in Illinois during the relevant time period.

[19] See Bear Wolf, Inc. v. Hartford Ins. Co. of the Southeast, 819 So.2d 818 (Ct.App.4th 2002)(Court holding under identical Hartford language at issue here, "we see no reason to read 'widespread public distribution' so narrowly as to exclude a display at one of the industry's largest trade shows, whether it was open to the public or not"); Fireman's Fund Ins. Co. of WI v. Bradley Corporation, 261 Wis2d 4, 31 (Wis. S.C. 2003)("Creating brochures and displaying products at a trade

Finally, other courts in analyzing whether a causal nexus exists between the advertising activity and advertising injury have reached similar rulings as Judge Gottschall in Flodine I. *See* Stunfence at 1080(J. Shadur, citing with approval and adopting analysis in Flodine I, holding that "allegations that Stunfence used the Power Fence trademark and made false representations related to its own product provide a sufficient link between Gallagher's advertising and the injury"); and B.H. Smith at 540 ([W]here a complaint alleges harm resulting from the advertisement of knock-off or imitation products, "it would be artificial to deny coverage by constructing a distinction between the injury arising from the manufacture and sale of infringing goods and injuries arising from the marketing of these same goods by means of display or advertisement." The court also found that the "bare allegation of marketing of handbags" was enough to trigger coverage.[20]

## IX.  THE INSURERS ARE ESTOPPED TO DENY POLICY COVERAGE

### A. Under Illinois law, the Insurers are estopped to deny policy coverage

If the Court finds that Illinois law applies in this action, it is well-settled that once an insurer violates its duty to defend, it is estopped to deny policy coverage in a subsequent lawsuit by the insured or the insured's assignee. Maneikis at 821. (Citations omitted).  In Maneikis, the Seventh Circuit held "equitable estoppel is based upon the principle that the insurer has no right to insist that the insured be bound by provisions of the insurance contract inuring to its benefit,...when it has already breached the contract by violating the provisions inuring to the benefit of the insured. The estoppel arises at the moment the insurance company wrongfully refuses to defend." Id.  An insurer which breaches its duty to defend is liable for defense costs and the amount of any judgment or settlement. Id. at 827 (Citations omitted).

Under the authority and arguments set forth herein, the advertising injuries incurred by NAA

---

show clearly involve the widespread announcement or distribution of promotional materials. The complaint alleges that the brochures are used to promote the products; it also alleges that the trade show display was directed to customers").
[20] *See also* Kocolene at *15, Molding v. Am. Mfrs. Mutl. Ins. Co., 17 F. Supp. 2d 633, 638 (N.D. Tex 1998), and Ben Berger & Son, Inc. v. Am. Motorist Ins. Co., 1995 WL 386560 *4(S.D.N.Y. 1995)(Exhibit 4)(All holding there was a causal connection between advertising activity and advertising injury based upon plaintiffs request in its complaint for injunctive relief enjoining infringer's advertising)(See Am. Cmplt. ¶ 25, "Defendants advertisement... of Indian style goods in a manner that falsely suggests they are Indian products... is illegal and should be enjoined").

23

were clearly within, or potentially within, coverage provided by the insurers. The insurers had a duty to defend BB in the underlying litigation. Instead, the insurers declined to defend and abandoned BB. Therefore, under well-settled Illinois law, the insurers are estopped to deny policy coverage and are liable for defense costs in the underlying litigation. Under Illinois estoppel law, this Court need not do any further analysis to determine whether there was a duty to indemnify because the insurers are estopped to challenge such coverage. Thus, in the interest of judicial efficiency in avoiding an unnecessary subsequent motion regarding duty to indemnify, the Court should now grant judgment in favor of NAA for duty to defend and, also, duty to indemnify based on a finding of estoppel

### B. Under California law, the insurers are estopped to deny policy coverage

If the Court was inclined to adopt California law, it appears that California does not adopt estoppel principles in the same manner as Illinois. Sunseri at 561-562. Specifically, an insurer's breach of its duty to defend does not automatically result in an insurer being estopped to deny policy coverage. However, under California law, the insurers would still be estopped because California law provides that an insurer will be estopped if they engage in misconduct which was detrimentally relied upon by the insured.[21]

Here, Hartford in its declination letter on July 17, 2003, asserted to BB that it was not a named insured under the 99-00 policy and, as such, that Hartford would not defend BB in the underlying litigation. Great American's declination letter also stated that BB was not a named insured under the 00-01 policy. As stated in § IV(A) and incorporated herein, this is undeniably wrong.

Such conduct was done solely to mislead BB that they did not have coverage under the relevant policies. Throughout the underlying litigation, including settlement negotiations, NAA detrimentally relied upon the insurers' assertions that BB did not have coverage which fundamentally affected settlement terms. (See NAA's Uncontested Facts ¶ 75). Obviously, the value of any settlement, including the value of the assignment and amounts paid, is affected by potential coverage under the policies. Because NAA believed, based on the insurers' assertions, that BB was not covered

---

[21] See Miller v. Elite Ins. Co., 100 Cal.App.3d 739, 754 (1980); Ward v. Allstate Ins. Co., 964 F. Supp. 307, 312 312 (C.D. Cal. 1997); and Fireman's Fund Ins. Co. v. Davis, 37 Cal.App.4th 1432, 1441 (1995).

24

under the policies NAA undervalued the claims during the 99-00 policy. Now, NAA in this declaratory action is bound by those settlement amounts. The insurers should not benefit by their own act of misleading their insured, and other parties resulting therefrom, regarding coverage and should now be estopped to deny coverage. However, because California estoppel is a more fact-specific inquiry, NAA does not request that the Court rule on this issue at this time but, rather, should wait, if California law is applied, until the duty to indemnify phase.

## X.    CONCLUSION

Hartford and Great American breached their duties to defend their insured, Bloom Brothers. Under Illinois law, which should be applied, the insurers are also estopped to deny their duties to indemnify BB. As such, NAA is entitled to judgment as a matter of law that the insurers breached their duties to defend and indemnify. Upon judgment, the only remaining issue is whether the settlement between NAA and BB reflected a reasonable anticipation of liability and the amount was reasonable. In addition, based on the insurers breach of their duties to defend, NAA is entitled to collect BB's attorneys fees and costs from the underlying litigation ($134,444.28).

Respectfully submitted,

One of the attorneys for Plaintiff

Michael P. Mullen
Scott M. Kolosso
Carla E. Buterman
Mullen & Foster
166 W. Washington St., Suite 600
Chicago, IL 60602
312-750-1600